**UNITED STATES of America**

v.

**Jerry CARR, Jr., Appellant.**

**No. 23004.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 11, 1970.

Decided Nov. 2, 1970.

Mr. William R. Malone, Washington, D. C. (appointed by this court) for appellant.

Mr. Warren R. King, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, McGOWAN and MacKINNON, Circuit Judges.

PER CURIAM:

After a jury trial, appellant was convicted of first-degree murder and two counts of assault with a dangerous weapon. The incident involved the stabbing of the female decedent with whom appellant had been emotionally involved. The principal defense was insanity, although there was also some testimony by appellant to the effect that the killing occurred in a heat of passion. There was conflicting evidence from expert

witnesses on both sides as to the insanity issue, but appellant does not contend on this appeal that the jury's resolution of this question against him was without adequate foundation in the evidence.

The errors pressed upon us relate mainly to the giving of testimony by a private psychiatrist who appeared for the defense. Prior to trial defense counsel had arranged for his witness to examine appellant, a central purpose being to determine whether appellant should be examined under the influence of truth serum in order to improve his powers of recall. A day after the examination, the witness dictated notes of it and a few days after that wrote defense counsel a letter. During cross-examination of this witness at trial, the prosecutor asked for any notes or reports made by the witness, and the court directed that the notes and letter be made available to him.

■ It is first argued that the court erred in making these documents available to the prosecution at all. It is variously asserted that they fell under the physician-patient privilege, or are protected by the right to counsel, the attorney-client privilege, or their status as counsel's work-product. In this jurisdiction, however, the first of such privileges is subject to two statutory exceptions which are relevant here.[1] Further, since appellant was given prompt access to all of the Government's psychiatric records, Rule 16(c), Fed.R.Crim.P., would appear to contemplate that similar records in the hands of the defense should be accessible to the Government.[2]

■■ Where the mental state of an accused is at issue in a criminal case, it is, as the Government asserts in its brief, "in the interest of public justice" for the trial court to permit "both the Government and the defendant full access to the reports and conclusions of all psychiatric witnesses" in order to enable the trial court "to present a complete exploration of the mental state of the accused to the jury." This is a proposition with which this court is fully in accord; and one which overrides the claims founded upon the attorney-client relationship. The latter privilege, in any event, seems inoperative here for the reason that the defense expert's opinion, as expressed in the notes and letter, had been immediately communicated by him to a representative of the Government.

1. 14 D.C.Code § 307 is a statutory recognition of the physician-patient privilege, but there are express exceptions for both death cases and the defense of insanity. The statutory language is as follows:

  (a) In the courts of the District of Columbia a physician or surgeon may not be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, that he has acquired in attending a patient in a professional capacity and that was necessary to enable him to act in that capacity, whether the information was obtained from the patient or from his family or from the person or persons in charge of him.

  (b) This section does not apply to:

    (1) evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice; or

    (2) evidence relating to the mental competency or sanity of an accused in criminal trials where the accused raises the defense of insanity, or in the pretrial or posttrial proceedings involving a criminal case where a question arises concerning the mental condition of an accused or convicted person.

2. The Advisory Committee on Federal Rules of Criminal Procedure comments as follows in its Note to Rule 16(c):

While the government normally has resources adequate to secure the information necessary for trial, there are some situations in which mutual disclosure would appear necessary to prevent the defendant from obtaining an unfair advantage. For example, in cases where both prosecution and defense have employed experts to make psychiatric examinations, it seems as important for the government to study the opinions of the experts to be called by the defendant in order to prepare for trial as it does for the defendant to study those of the government's witnesses.

Appellant asserts, however, that even if the court properly made the notes available to the prosecution, the court should not have permitted the prosecutor to read from them in the jury's presence. The matter arose in this wise: Detecting an inconsistency between the witness's testimony at trial and an expression of opinion contained in the notes, the prosecutor proposed to refresh the witness's recollection by reading from the notes and, if the apparent inconsistency was not resolved, by referring to the notes for impeachment of credibility. The court permitted the prosecutor to proceed in this fashion. The witness endeavored to explain the apparent inconsistency, with debatable results; the court instructed that the matter could be considered by the jury as going only to the weight they should give to the witness's testimony; and the prosecutor so referred to it, without objection, in his closing argument. We find no departure from familiar norms of acceptable trial procedure.

Lastly, it is said that reversible error was committed when the trial court substituted for the standard instruction theretofore used on the consequences of a finding of not guilty by reason of insanity, the instruction more latterly prescribed by us in Bolton v. Harris, 130 U.S.App.D.C. 1, 10 n. 50, 395 F.2d 642, 651 n. 50 (1968). *See also* United States v. Grimes, 137 U.S.App. D.C. 184, 421 F.2d 1119 (1969), cert. denied, 398 U.S. 932, 90 S.Ct. 1831, 26 L.Ed.2d 98 (1970). Defense counsel ex-

plicitly represented on the record that he had no objection to this substitution; and the error, if any, is surely not of the "plain" variety contemplated by Rule 52(b), Fed.R.Crim.P.

Affirmed.

BAZELON, Chief Judge (dissenting):

I cannot agree with the court's description of the facts relating to the admission of the disputed evidence in this case, and I cannot concur in the conclusion that no reversible error occurred.

I

At issue are certain notes written down by the private psychiatrist who examined appellant upon request of defense counsel. The relevant portion of these notes is reproduced in the margin.[1] The first question appellant raises is whether these notes are privileged. The court holds that the notes cannot be privileged under the statutory physician-patient privilege, because of the exceptions written into 14 D.C.Code § 307. The court then finds that no claim founded upon the attorney-client privilege—or upon an analogue thereof—can succeed because "it is in the interest of public justice for the trial court to permit both the Government and the defendant full access to the reports and conclusions of all psychiatric witnesses." This latter subject, it seems to me, merits closer consideration than the court appears to give it.[2] At the very least, when a psychiatrist has recommended that a certain test not be given and his reasons turn

---

1. "I will advise [defense counsel] that it will be inadvisable to subject this individual to pentothal hypnosis since it will give us no information we don't already have. It is also very likely that what would come out would be he had in fact gone to [deceased's] sister's house with the intention of forcing [deceased] to talk to him or else he would kill her. I believe this is in fact what was probably going on in his mind. To most of the laymen on a jury, this would be sufficient to clinch a conviction of first-degree murder. It would be most difficult to convey to them the truth of the matter in a way they could understand,

namely, that an intention conceived purely under the pressure of an uncontrollable emotion is in fact no different from impulse which has not been subjected to any rational control. Even though the action is carried out over a relatively long period of time, i. e., it is not truly premeditated as the word is understood. Proper explanation would involve going into the nature of defensive operations of the ego-structural formulation and what is the nature of an effective control in general."

2. *See* my concurrence in Proctor v. Harris, 134 U.S.App.D.C. 109, 413 F.2d 383 (1969).

out to be strategic rather than medical, it is not clear that we are dealing with the kind of "reports and conclusions" that need to be disclosed to ensure "complete exploration" of the mental state of accused.

The court finally dismisses appellant's argument from the attorney-client privilege on the grounds that the notes in question had in fact been communicated by the psychiatrist himself to a representative of the Government. As far as I can discover from the record, all that was reported to a representative of the Government was the psychiatrist's opinion that narco-analysis (here, pentothal hypnosis) would not be useful. The main subject of the notes read at trial was the psychiatrist's fear of the jury's misunderstanding what would probably be said under narco-analysis, and there is no indication that this fear—much less the specific content of the notes—was communicated to anyone connected with the Government.

Although I disagree with the court's reasoning on the issue of privilege, I cannot find in the record an objection by defense counsel to disclosure of the notes. Since, in addition, I find other grounds for reversal of this conviction, I do not think it is necessary to attempt to resolve, on this record, the difficult question of privilege that appellant raises.

## II

Appellant urges that even if the notes were not privileged, they were improperly read to the jury and improperly referred to by the prosecutor in his closing argument as being in evidence. I agree that the circumstances surrounding the reading of the notes to the jury and the prosecutor's closing argument require reversal.

While the court passes over the precise manner in which the psychiatrist's notes were finally read to the jury, I find it very troubling. In lengthy discussions at the bench, the trial judge went to exemplary lengths in explaining to the prosecutor that he could proceed by way of refreshment or impeachment. If the first course was adopted, the proper procedure was to establish a failure of memory, offer the notes to the witness, and ask if they refreshed his memory. If the second was adopted, the prosecutor must lay a foundation—that is, elicit testimony from the witness which contradicted the written notes—and then he would be permitted to read the notes to the jury. But in that case, the judge said he would be required to give an immediate instruction that the notes went only to credibility and not to the truth of the matter asserted. I think that the trial judge correctly stated the law,[3] and it is unfortunate that in the ensuing confusion, his rules were not followed. The prosecutor announced that he would proceed by way of refreshment and shortly thereafter read portions of the notes to the jury. No immediate instruction was given. We said in Jones v. United States [4] that failure to give such an instruction is plain error. The damaging effect of the psychiatrist's notes is clear on reading them, and the attention that prosecution and defense devoted to them in their closing arguments only emphasizes their importance.

The court states that in his closing argument the prosecutor referred to these notes only as going to the weight the jury should give to the psychiatrist's testimony. I cannot agree. I feel it necessary to quote at some length from the prosecutor's comments, if only to make perfectly clear that the dangers of admitting such notes for credibility alone is very great.

3. For the inappropriateness of reading material to the jury when the purpose is refreshment, see Young v. United States, 94 U.S.App.D.C. 62, 214 F.2d 232 (1954), and Gaines v. United States, 121 U.S.App.D.C. 213, 349 F.2d 190 (1955). For the mandatory instruction when prior statements are brought to the jury's attention to impeach a witness, see Jones v. United States, 128 U.S.App.D.C. 36, 385 F.2d 296 (1967).

4. *Id.*

Now what else did [this psychiatrist] tell us? He told us that he had taken and made some notes of his interview. * * * And he says in the notes, ladies and gentlemen, *this is in evidence,* and I will quote it to you as it appeared *in evidence:*

"I would advise [defense counsel] that it would be inadvisable to subject this individual to pentothal hypnosis since it will give us no information we do not already have. It is very likely that what would come out would be that he had in fact gone to [deceased's] sister's house with the intention of forcing [deceased] to talk to him or else he would kill her."

And then he goes [on] to say in a further sentence after that—these were his words, [this psychiatrist's] own words, "I believe this is in fact what was probably going on in his mind."

Now, think about this, ladies and gentlemen, for a moment, if you will. What does this tell us about? * * * [This psychiatrist] is telling us here that if this man was subjected to this test he would * * * say under the influence of the sodium pentothal that he intended to go to that house and talk to [deceased] or else he would kill her. * * * So no matter how you look at it, ladies and gentlemen, you look at it from one side and you look at it from the other side. What is the significance? * * * It has great significance that [this psychiatrist] gave the interpretation of what he felt Jerry Carr's intention was when he was going over to that house. [Emphasis added.]

I cannot see how anyone can read this argument and expect that a jury would understand from it that the notes should be considered only on credibility and not on the substance of a critical issue in the case—appellant's premeditation and sanity.

The prosecutor's remarks that the notes were in evidence is by itself a distressingly blatant error for a representative of the Government.[5] The cumulative weight of the errors relating to the psychiatrist's notes is great enough, I feel, that the trial judge's inclusion of the standard instruction on impeachment at the end of trial was insufficient to protect against the misuse of the notes by the jury. I think we are bound to reverse and remand for a new trial.

---

5. Defense counsel made no objection to the prosecutor's argument, and I find it unnecessary to decide whether the argument alone would constitute plain error meriting reversal.