John P. CLIFFORD, Appellant,

v.

UNITED STATES, Appellee.

No. 85–319.

District of Columbia Court of Appeals.

Argued April 16, 1987.

Decided Sept. 30, 1987.

J. Herbie DiFonzo, Washington, D.C., for appellant.

Joan C. Barton, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before PRYOR, Chief Judge, and FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

John P. Clifford appeals his conviction for assault with intent to commit a sexual act. D.C.Code § 22–501 (1981). He contends the trial court wrongly excluded expert testimony about his psychological condition and the likelihood that he was under the influence of drugs when he committed the acts for which he was convicted. He also argues the trial court abused its discretion by instructing the jury that, in weighing Clifford's testimony, it "may consider the fact that the defendant has a vital interest in the outcome of this trial." We conclude the trial court did not abuse its discretion in forbidding Clifford's expert witness to testify. The court correctly excluded the expert evidence because defense counsel refused to disclose the results of psychological tests that substantially provided the basis for the expert's opinion. Furthermore, although we do not favor singling out a defendant for a special bias instruction, we also find no reversible error in giving the "vital interest" instruction in this case. We therefore affirm Clifford's conviction.[1]

## I.

The complainant was a female patient at St. Elizabeths Hospital. Clifford was a housekeeper for the building in which she lived. According to the complainant's testimony, on the morning of May 10, 1984, Clifford found her in the day room of her building and asked her to follow him out of the room. She followed him down a hall until they came to a door opening onto stairs to the basement. Clifford began to walk down. When the complainant did not follow, he took her by the arm and pulled her down the stairs. She called out for help. As Clifford forced her down into the basement he asked the complainant to have sex with him, but she said she would not. Clifford pulled the complainant into a basement storage room and locked the door behind them. He showed her magazine photographs of women performing oral sex on men and said he wanted her to do the same for him. She refused. Clifford then reached up under the complainant's skirt and began to pull down her panties and stockings; she began again to scream for help and to bang on the wall. Two members of the hospital staff, Frank Lynch and Wiley Trimmier, opened the storage room door, and Clifford ceased the assault.

Clifford testified on his own behalf. He gave a very different account of the events leadings to his being found in the basement room with the complainant, but this part of Clifford's defense is not the subject of his appeal. Instead, his primary argument on appeal relies on the premise that he was involuntarily intoxicated or drugged during the events at issue. The evidence consisted of several elements.

First, Clifford testified that during the morning of May 10 he had bought a candy bar from Trimmier. He stated that after eating most of the candy bar he had begun to feel "hyper," with "a distorted feeling of dizziness," and "in a daze;" he recalled that his vision became intermittently blurred and that he felt "abnormal." Second, the defense drew on testimony by four women employed at St. Elizabeths Hospi-

---

1. During trial, Clifford sought access to the complainant's medical records from St. Elizabeths Hospital to see whether they revealed grounds for seeking a psychiatric examination to determine her competency to testify. Rather than turn the records over to defense counsel, the trial court examined the records *in camera.* Following this examination, the court found the records gave no reason to doubt competency. We too have examined the records and perceive no reason to reverse the trial court's finding.

tal. Each recounted separate incidents during the morning of May 10 in which Clifford unexpectedly touched her in a sexual manner; for example, in one incident, Clifford had brushed his face against the woman's cheek, then smiled at her and rubbed his face against her from her shoulder down to her breast. All four women stated that in their experience Clifford had never before behaved in this manner. In addition, a female detective testified that, as she prepared paperwork on Clifford at the police department's Sex Offense Branch office, Clifford, who was seated next to her desk, ran his right hand up along her leg, beneath her dress as high as her knee, until she stopped him. The detective also testified that as he sat in the office, Clifford would leer at any woman walking nearby.

The third element of evidence with which Clifford hoped to persuade the jury of his intoxication theory was the expert testimony of a clinical psychologist, Dr. Michael Smith. During a recess in the trial, the defense and government attorneys questioned Dr. Smith about his qualifications and the testimony he would give. Dr. Smith testified that he had conducted "a psychological evaluation interview" of Clifford since his arrest and had reviewed psychological tests administered by another psychologist, Dr. Gibbs, under Dr. Smith's supervision. Thus, Dr. Smith explained that he based his opinion in part on his own interview of Clifford and in part on "test protocols," that is, the written notes Dr. Gibbs took while subjecting Clifford to a series of standard psychological tests. Dr. Smith stated that in seeking an explanation for Clifford's behavior, "based on my interview with Mr. Clifford and my review of the test protocol, the only thing I could come up with is possibly a drug induced state; either self-ingested or involuntary." In Dr. Smith's opinion the interview and

test protocols showed Clifford not to have the personality traits of a person who would likely engage in "that kind of bizarre or antisocial or inappropriate behavior." The court, however, ruled Dr. Smith's testimony inadmissible.

At the close of the evidence, Clifford sought a jury instruction on the lesser included offense of simple assault, basing his request on Clifford's description of his state of mind and on the circumstantial evidence that he had acted out of character. The government objected that the intoxication theory was too speculative to permit an instruction, since Clifford presented no direct evidence that he actually had ingested a drug, and that the suggestion he had eaten a spiked candy bar was highly implausible. With considerable reservation, however, the court agreed to give the instruction and to allow the defense to argue the drug theory. The court went on to tell the jury it should convict Clifford of simple rather than aggravated assault if it found he was so far under the influence of drugs that he was "incapable of forming the specific intent to commit a sexual act." The jury, however, found Clifford guilty of the greater offense of assault with intent to commit a sexual act.

## II.

■ Clifford argues he was erroneously deprived of the benefit of Dr. Smith's expert opinion that he was probably acting under the influence of drugs. The decision whether to admit expert testimony lies within the "broad discretion" of the trial court and will be reversed only if "manifestly erroneous." *Adams v. United States*, 502 A.2d 1011, 1020 (D.C.1986); *Harris v. United States*, 489 A.2d 464, 470 (D.C.1985); *Taylor v. United States*, 451 A.2d 859, 866 (D.C.1982), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2105, 77 L.Ed.2d 311 (1983).[2] We conclude that the trial court

2. In *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962), the Supreme Court observed that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." Courts often invoke the "broad discre-

tion" and "manifestly erroneous" standard; other courts merely state that trial court decisions will be reversed for "abuse of discretion." But, to our knowledge, no court has attempted to explain whether the "manifestly erroneous" standard differs, and if it does precisely how it differs, from the general abuse of discretion

did not abuse its discretion because defense counsel refused to produce, for examination by government counsel, the test protocols on which Dr. Smith in part based his opinion.

### A.

"The defense should be free to introduce appropriate expert testimony." *Kaplan v. California,* 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973); *see also Ibn–Tamas v. United States,* 407 A.2d 626, 632 (D.C.1979); *Fennekohl v. United States,* 354 A.2d 238, 240 (D.C.1976).[3] Expert opinion evidence generally should be admitted whenever it will not mislead the jury and will prove useful in understanding the facts in issue. *Dyas v. United States,* 376 A.2d 827, 831 (D.C.) (stating that "expert testimony is admissible if it is 'likely to aid the trier in the search for truth.' ") (quoting *Jenkins v. United States,* 113 U.S.App.D.C. 300, 306, 307 F.2d 637, 643 (1962) (en banc)), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *Douglas v. United States,* 386 A.2d 289, 295 (D.C.1978) (stating that "even relevant and material information must be excluded if its admission would create a substantial danger of undue prejudice or would mislead the jury"). In order to further the policy of bringing useful expert testimony before the jury, courts in this jurisdiction have long permitted psychological and other medical experts to base their evaluations on tests and reports prepared by others. See, e.g., In re Samuels, *507 A.2d 150, 152 & n. 3 (D.C. 1986);* Jenkins v. United States, *113 U.S. App.D.C. 300, 303–05, 307 F.2d 637, 640–42 (1962).* Even though a report itself is hearsay, a psychologist may rely on it in arriving at an opinion if he or she "customarily relies" on such reports "in the practice of [the] profession." Jenkins, *113 U.S.App.D.C. at 304, 307 F.2d at 641;* see also FED.R.EVID. 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [on which the witness bases an opinion] need not be admissible in evidence."); E. CLEARY, ET AL., MCCORMICK ON EVIDENCE § 15 (3d ed. 1984). Thus, as the trial court recognized, the fact that Dr. Smith grounded his psychological evaluation of Clifford in large part on test results written by Dr. Gibbs could not by itself justify excluding his testimony.

Courts traditionally have required the party presenting opinion evidence to lay a foundation for it—that is, to make clear the facts upon which an opinion was based—by presenting the facts through direct testimony of the expert, or by introducing independent evidence showing the facts, or, most commonly, by posing hypothetical questions which, in theory, set out all the facts needed to justify the opinion. 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 705[01] (1985). These methods have not proved very satisfactory. Hypothetical

standard. In our view, all these terms simply reflect that decisions on the admission of expert evidence frequently rest on judgments derived from "the trial court's opportunity to observe, hear, and otherwise evaluate the witness"—an opportunity we do not share. *Ibn–Tamas v. United States,* 407 A.2d 626, 635 (D.C.1979). We can see no reason in principle, however, that determinations on the admissibility of expert evidence deserve greater deference by a court of appeals than do other evidentiary and similar discretionary rulings.

**3.** A defendant's proffered expert evidence is appropriate and should be admitted when it meets the three part test our cases have frequently repeated:

(1) the subject matter "must be so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman;" (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling to make it appear that his opinion or inference will probably aid the trier in his search for truth;" and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

*Dyas v. United States,* 376 A.2d 827, 832 (D.C. 1977) (quoting E. CLEARY, ET AL., MCCORMICK ON EVIDENCE § 13, at 29–31 (2d ed. 1972)), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *see also Adams v. United States,* 502 A.2d 1011, 1020 (D.C.1986) (citing cases). Having determined the evidence admissible under these standards, a trial court may still exclude expert testimony if in the court's view its prejudicial effect will outweigh its probative value. *E.g., Ibn–Tamas,* 407 A.2d at 639–40.

questions, the most common technique for laying a foundation for psychological testimony, have received especially strong criticism as unrealistic, inefficient, and subject to abuse through the crafting of highly biased hypotheticals. *See, e.g., id.;* McCormick on Evidence § 16; Fed. R. Evid. 705 advisory committee notes; Diamond & Loisell, *The Psychiatrist As An Expert Witness: Some Ruminations and Speculations,* 63 Mich.L.Rev. 1335, 1346–48 (1965).

In response to this criticism, Fed.R.Evid. 705 was adopted in 1975. It provides:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Although hypothetical questions are still permitted under the federal rules, the aim of Rule 705 is to replace the need for hypotheticals with reliance on cross-examination to bring out the basis of an expert's testimony. Use of the adversary process should allow the opposing attorneys to explore an expert's reasoning more selectively and, hence, more efficiently, while reducing the opportunities for deceptive manipulation of the testimony. 3 Weinstein's Evidence ¶ 705[01], at 705–06 (1985) (quoting 2 Wigmore, Evidence § 686, at 813 (3d ed. 1940)); McCormick on Evidence § 16.

Two elements of Rule 705 are essential to achieving these ends: first, the party presenting expert testimony can elect not to disclose some or all of the facts underlying the opinion evidence; but, second, the court may compel disclosure of the entire basis before the witness testifies, and, in any event, the opponent can elicit the basis during cross-examination.

The structure Rule 705 provides for the presentation and cross-examination of expert testimony is both wise and consistent with the caselaw of this jurisdiction. We have previously held that a defendant's expert psychiatric witness called to support an insanity defense "must inform the jury as to the bases for his conclusions as well as the nature of the disability, its characteristics, and its symptomology." *Bethea v. United States,* 365 A.2d 64, 81 (D.C. 1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *see also United States v. Tyler,* 376 A.2d 798, 806 (D.C.1977). In light of the weaknesses to which hypothetical questions are prone in many trial situations, we agree that the basis of expert opinions need not be stated during direct examination. But, by the same token, an expert witness "may in any event be required to disclose the underlying facts or data on cross-examination." Fed.R.Evid. 705.[4] The need to permit a criminal defendant the means to expose the basis of expert evidence against him is

**4.** This part of Rule 705 has been read to allow expert witnesses, in both direct and cross-examination, to describe events, conversations, and the contents of written reports that were otherwise inadmissible, for example, as hearsay. In such cases, the testimony is admitted not as substantive evidence but "for the limited and independent purpose of enabling the jury to scrutinize the expert's reasoning." *United States v. Wright,* 251 U.S.App.D.C. 276, 285, 783 F.2d 1091, 1100 (1986); *see also United States v. Gillis,* 773 F.2d 549, 553–54 (4th Cir.1985); *United States v. Ramos,* 725 F.2d 1322, 1324 (11th Cir. 1984); *People v. Anderson,* 113 Ill.2d 1, 99 Ill. Dec. 104, 495 N.E.2d 485, *cert. denied,* —— U.S. ——, 107 S.Ct. 658, 93 L.Ed.2d 713 (1986). We do not discuss the *admissibility* of any hearsay that might be contained in the test protocols prepared by Dr. Gibbs, since we hold the court had sufficient grounds to exclude Dr. Smith's testimony when Clifford's attorney refused to *produce* the protocols for inspection by the government prior to Dr. Smith's testimony before the jury. We do note, though, that hearsay evidence against a criminal defendant may raise question of the defendant's constitutional right to confront witnesses. *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (holding that hearsay evidence does not violate the confrontation clause if declarant is unavailable and it "bears adequate 'indicia of reliability'"); *Wright,* 251 U.S.App.D.C. at 286, 783 F.2d at 1101 (stating that expert's recounting of statements by codefendants did not violate confrontation clause because statements were not introduced for truth of matter asserted and declarant testified at trial); *cf. Bryan v. John Bean Div. of FMC Corp.,* 566 F.2d 541, 545 (5th Cir.1978) (holding that "otherwise hearsay evidence disclosing the basis of an expert witness' opinion should be admissible if … the impeaching evidence has sufficient guarantee of reliability that the prophylactic effect of the hearsay rule is not necessary to ensure trustworthiness").

particularly strong. *See Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 296, 88 L.Ed.2d 15 (1985) (noting the possibility that "the introduction of expert testimony with no basis could ... be so lacking in reliability, and so prejudicial, as to deny a defendant a fair trial"); *United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir. 1971) (en banc) (stating that introduction of expert opinion without opportunity to cross-examine author as to bases of opinion would infringe confrontation clause rights of defendant), *cert. denied,* 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972); 3 WEINSTEIN'S EVIDENCE ¶ 703[04]. Rational use of expert evidence in the courtroom, however, demands that defense testimony be equally open to scrutiny by the government. *Cf. District of Columbia v. Cooper,* 483 A.2d 317, 322–23 (D.C.1984) (holding that civil defendant had the right to cross-examine plaintiff's expert psychological witness about plaintiff's juvenile record, in part because examination of this record formed part of the basis for expert's testimony).

 We also agree that the trial court must have the discretion provided in Rule 705 to compel production of the basis of an expert opinion, including reports prepared by others, before the expert testifies.[5] This power is a necessary complement to the proponent's right not to explain the entire basis of an opinion on direct examination. If expert opinions are to be fully dissected and scrutinized before the jury, an opponent must have the opportunity for full cross-examination about the opinion's basis; and, to ensure a fair opportunity to develop effective cross-examination, an opponent generally must be allowed access to the records or reports on which the witness relied. Thus, the presumption that each party have direct access to documents con-

---

5. Whether the trial court may order disclosure of the basis before trial is a question we do not decide, for here the court acted during trial. We observe, however, that were the defense or government in a criminal proceeding to notify its opponent of its intention to call a specific expert witness, permitting the court to order pretrial production of the basis of the expert's planned testimony could in some circumstances amount to an expansion of the limited pretrial discovery powers in criminal cases authorized by Super.Ct.Crim.R. 16. Specifically, Super.Ct. Crim.R. 16(b)(1)(B) mandates defense disclosure of medical or scientific reports relating to a witness' testimony only when the defendant has first requested similar disclosure by the government. Unlike the FED.R.CRIM.P. 16, however, the District of Columbia rule does not provide for pretrial discovery of prosecution and defense witnesses (except alibi witnesses). D.C.Code § 24–301(j) (1981) and Super.Ct.Crim.R. 12.2 do require notice of a defendant's intention to raise an insanity defense but do not require disclosure of witnesses or records on which they will rely. Thus, our adoption of Rule 705 raises the question whether a trial court may expand pretrial discovery in cases where the defendant must give notice of an insanity defense, thereby implying the intention to call expert witnesses, or where one party voluntarily discloses its intention to call an expert witness. Still, unlike discovery rights under Rule 16, under today's ruling only the trial court can compel production of data, and the decision to do so is discretionary.

In any event, we do not read Super.Ct.Crim.R. 16(b)(2) to conflict with our ruling here. Rule 16(b)(2) states:

> Except as to scientific or medical reports, this paragraph does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case....

Usually, any report made by an agent of the defendant that could form the basis of intended expert testimony would take the form of a scientific or medical report and so would not fall within this rule. Even were such a report to take another form, however, Rule 16(b)(2) would not preclude its discovery, for we understand this provision only to state the limits of discovery under the authority of Rule 16, not the limits of the court's potential discovery powers. *See Middleton v. United States,* 401 A.2d 109, 116–20 (D.C.1979) (noting that while "any venture beyond the[ ] limited principles [of the Jencks Act and Rule 16 discovery] must be subjected to close scrutiny," more extensive disclosure may be sustained "[i]n proper circumstances" under the court's "'inherent powers' over the discovery process"). Furthermore, to the extent that our ruling here authorizes discovery during trial, Rule 16 is irrelevant, for it applies only to pretrial discovery. *See United States v. Nobles,* 422 U.S. 225, 234–35, 95 S.Ct. 2160, 2168–69, 45 L.Ed.2d 141 (1975) (holding that FED.R.CRIM.P. 16 does not control court's discovery power once trial has begun); *Waldron v. United States,* 370 A.2d 1372, 1373 (D.C.1977) (holding that Super.Ct.Crim.R. 16 "is to be construed consistently with the federal rule").

tributing to the expert's conclusion is essential in an evidentiary regime that permits expert testimony to rely on hearsay data. *See, e.g., Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560–66 (7th Cir.1984); *United States v. Lawson*, 653 F.2d 299, 302 (7th Cir.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982); *see also United States v. Mangan*, 575 F.2d 32, 47–48 (2d Cir.) (criticizing government's failure to show defense blow-up photos used by fingerprint expert but finding that cross-examination by defense counsel was not sufficiently prejudiced to reverse conviction), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978). It is, then, "in the interest of public justice" to permit both sides "full access to the reports and conclusions of all psychiatric witnesses" in order to ensure "a complete exploration of the mental state of the accused to the jury." *United States v. Carr*, 141 U.S.App.D.C. 229, 229–30, 437 F.2d 662, 662–63 (1970), *cert. denied*, 401 U.S. 920, 91 S.Ct. 907, 27 L.Ed.2d 823 (1971). For this reason, we agree with commentators who have argued that in criminal cases, where the parties do not enjoy the benefit of broad discovery, the courts should readily exercise the power to compel disclosure of the basis before the witness testifies. 3 WEINSTEIN'S EVIDENCE ¶ 703[4], at 703–26, & ¶ 705[01], at 705–10; McCORMICK ON EVIDENCE § 16; *see also* FED.R. EVID. 705 advisory committee notes (suggesting that rationale for Rule 705 "assumes that the cross-examiner has the advance knowledge [of underlying facts or data] which is essential for effective cross-examination").

█ We therefore adopt the provision of Fed.R.Evid. 705 under which the trial court may order that a party proffering expert testimony turn over for inspection by the opponent any report or document on which the expert relied in forming the opinion to which he or she will testify. *Cf. Laumer v. United States*, 409 A.2d 190 (D.C.1979) (adopting Fed.R.Evid. 804(b)(3) concerning admissibility of declarations against penal interest). The decision whether to order production of the documentary basis for an expert opinion is discretionary with the court but should be readily exercised to ensure that each side receives sufficient information to conduct effective cross-examination. 3 WEINSTEIN'S EVIDENCE ¶ 705[01], at 705–10; McCORMICK ON EVIDENCE § 16. In ordering production before the witness testifies, the trial court should frame its order narrowly to accomplish the purpose of facilitating cross-examination of the expert and should remain sensitive to the defendant's right against self-incrimination or any "improper annexation of his counsel's labors." *Middleton v. United States*, 401 A.2d 109, 116 n. 11 (D.C.1979); *see also Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *United States v. Nobles*, 422 U.S. 225, 236–40, 95 S.Ct. 2160, 2169–71, 45 L.Ed.2d 141 (1975); *United States v. Madrid*, 673 F.2d 1114, 1120–21 (10th Cir.), *cert. denied*, 459 U.S. 843, 103 S.Ct. 96, 74 L.Ed.2d 88 (1982).

### B.

█ Here, we can see no ground for concluding the trial court abused its discretion in ordering production of the test protocols. During cross-examination of Dr. Smith, the government requested to see the protocols. The court stated it was "elementary" that the government was "entitled to know the basis upon which this witness states his opinion." The trial court expressed its doubts about the quality of Dr. Smith's rather unusual expert testimony. In contrast with the typical insanity defense, Clifford sought to use the psychologist's opinion to show he would not have committed an act such as the charged assault unless on drugs, and he advanced this argument without any direct evidence he had in fact consumed a particular drug or, indeed, any drug at all. The trial court viewed Dr. Smith's opinion as somewhat speculative in the evidentiary context of the case. Moreover, the court noted that it found Dr. Smith himself less than certain of the conclusion that Clifford could not have committed the assault unless on drugs: "I listened and listened for some reasonable degree of medical certainty, and didn't hear it" in Dr. Smith's testimony.

Its doubts about the plausibility of Clifford's intoxication defense and the reliability of Dr. Smith's conclusions justified the court's decision to require production of the protocols.

■ Disclosure of the protocols relied on by Dr. Smith would have presented no problem of coerced self-incrimination, interference with assistance of counsel, or testimonial privileges. Obviously, unless the defendant has waived the fifth amendment right against self-incrimination and the sixth amendment right to counsel, the government cannot attempt to prove guilt or to determine punishment with expert testimony based on statements of the accused made during a compelled psychiatric examination. *Estelle v. Smith*, 451 U.S. 454, 461–71, 101 S.Ct. 1866, 1872–77, 68 L.Ed.2d 359 (1981); *see* Super.Ct.Crim.R. 12.2(c). The present case, however, suggests no fifth amendment or right-to-counsel concerns because the examination was undertaken entirely at Clifford's own bidding. The privileges against self-incrimination and the right to counsel could protect the defendant only during interrogation by agents of the government. *See, e.g., Colorado v. Connelly*, —— U.S. ——, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986); *Estelle v. Smith*, 451 U.S. at 466–67, 101 S.Ct. at 1875 (citing *Miranda v. Arizona*, 384 U.S.

436, 467–69, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694 (1966)); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Dr. Gibbs and Dr. Smith, however, examined Clifford at his own request and were not acting, directly or indirectly, for the government. Their examinations of Clifford and their subsequent testimony, therefore, could not violate Clifford's fifth or sixth amendment rights. *See Arizona v. Mauro*, —— U.S. ——, 107 S.Ct. 1931, 1934–35, 95 L.Ed.2d 458 (1987); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Accordingly, no fifth or sixth amendment considerations could have barred production of the protocols to government counsel.[6]

■ Production of the protocols also would have presented no infringement of the privilege shielding the defense attorney's work-product. *See Nobles*, 422 U.S. at 236–38, 95 S.Ct. at 2169–70 (holding that the work-product doctrine applies in criminal cases because "its role in assuring the proper functioning of the criminal justice system is even more vital" than its role in civil cases); *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Nobles*, the Supreme Court approved a trial court order compelling disclosure to the government of a defense investigator's re-

6. Nor is it likely that, even if relevant portions of the protocols themselves were introduced into evidence, Clifford's fifth or sixth amendment rights would have been violated. *But cf. supra* note 4. The psychologists were not government agents. Moreover, Clifford hoped to use Dr. Smith's testimony to support what was, in effect, a sanity defense. The defendant's mental state usually becomes an issue in an *insanity* defense, but, in either case, "where the defendant puts his sanity in issue, he is constructively deemed to have waived his [fifth amendment] privilege with respect to the sanity determination." *White v. United States*, 451 A.2d 848, 853 (D.C.1982). A contrary rule would often allow a defendant to "deprive [the government] of the only effective means of controverting his proof on an issue that he interjected into the case." *Estelle v. Smith*, 451 U.S. at 465, 101 S.Ct. at 1623. The defendant's own words are all the more clearly admissible when the defendant himself arranged the examination and called the psychologist to testify. A defendant may not testify on his own behalf but then refuse inculpatory cross-examination under pro-

tection of the fifth amendment. *Fitzpatrick v. United States*, 178 U.S. 304, 314–16, 20 S.Ct. 944, 948–49, 44 L.Ed. 1078 (1900). No more may a defendant call an expert psychologist to testify for him but shield the witness from incriminating cross-examination that legitimately goes to the defendant's mental condition. *United States v. Byers*, 239 U.S.App.D.C. 1, 10–11, 740 F.2d 1104, 1113–14 (1984) (en banc) (plurality opinion). Moreover, we have held that "a defendant has no Sixth Amendment right to the presence of counsel at a pretrial psychiatric examination" conducted by the government; "the presence of counsel [would] limit the effectiveness of the court-ordered examination" and should prove unnecessary because, unless appropriate *Miranda* warnings were first given, incriminating statements cannot be used to prove the defendant's guilt. *White*, 451 A.2d at 854. Thus, expert evidence is admissible on the issue of sanity even if the testimony discloses or is based on the defendant's statements to psychologists during a compelled examination and without counsel present.

port. The Court ruled that, in calling the investigator as a witness, the defendant waived the work-product privilege "with respect to matters covered in [the investigator's] testimony." *Nobles*, 422 U.S. at 239, 95 S.Ct. at 2170. This imputed waiver is justified for precisely the same reason that a defendant cannot "elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination." *Id.* at 240, 95 S.Ct. at 2171. In each case, the party presenting evidence cannot merely choose how much to disclose but must submit his or her evidence to the adversary process. *Cf. Middleton*, 401 A.2d at 118–19 (compelled disclosure of non-testifying defense investigator's report violated work-product privilege and sixth amendment right to effective assistance of counsel).

■ Clifford's counsel made a half-hearted attempt to persuade the trial court that it could not compel production of the protocols because they enjoyed some form of medical privilege. "The psychotherapist-patient privilege, like the physician-patient privilege did not exist at common law." *Developments in the Law—Privileged Communications*, 98 HARV.L.REV. 1450, 1539 (1985). It is, therefore, a "purely statutory creation." *In re Estate of Wilson*, 416 A.2d 228, 233–35 (D.C.1980) (describing the physician-patient privilege) (citations omitted); *see* D.C.Code § 14–307

(1981 & 1986 Supp.) (setting out the testimonial privilege for "[p]hysicians and mental health professionals"). In the District of Columbia, the statutory medical privilege is waivable by the patient or his or her legal representative. D.C.Code § 14–307(a) (1981). In our view, calling Dr. Smith as a witness would constitute a constructive waiver of the privilege when it otherwise applies. The interest in providing the government sufficient means to cross-examine a psychologist's expert testimony for the defense justifies a breach of the defendant's privacy.[7] Thus, once Clifford proffered Dr. Smith's testimony, the court would violate no testimonial privilege of Clifford's by ordering production of the protocols for government inspection.

■ The defense attorney did assert that the protocols were absolutely private because Dr. Gibbs enjoyed a personal privilege in their secrecy, a privilege Clifford therefore could not waive; according to defense counsel, test protocols are privileged in order to protect the privacy of both patient and doctor, so that even the patient could not waive their secrecy. Counsel, however, presented no basis for asserting such a privilege, and we can find none. Because no such privilege existed at common law, and we view medical privileges as "purely statutory creation[s]," the absence of a medical privilege held by the physician forecloses invoking such a bar to the trial court's order that the protocols be produced.[8]

---

**7.** *Cf.* D.C.Code § 14–307 (b)(2) (1986) (privilege does not cover "evidence relating to the mental competency or sanity of an accused in criminal trials where the accused raises the defense of insanity"); *United States v. Byers,* 239 U.S.App. D.C. at 10, 740 F.2d at 1113 (observing that while court should respect defendant's "private enclave of the human personality," when he "appeals to the nature of that enclave as the reason why he should not be punished for murder, and introduces psychiatric testimony for that purpose, the state must be able to follow where he has led"); *Carr,* 141 U.S. App.D.C. at 230, 437 F.2d at 663 (holding in insanity defense case that full scrutiny of defendant's mental state "overrides the claims founded upon the attorney-client relationship" that might block production of defense psychiatrist's examination notes); *Developments in the Law—Privileged Communications,* 98 HARV.L.REV. 1450,

1554 (1985) (arguing that when patient places own mental condition in issue, she has "a much-reduced, if not non-existent, expectation of privacy [in communications with psychotherapist] because she herself brings the issue to public attention").

**8.** We have noted earlier that in ordering production of the documentary basis for an expert opinion before a witness testifies, the court should frame its order narrowly to facilitate cross-examination consistent with the defendant's rights. We can anticipate complicated issues, not presented here, that may affect a court's decision on the extent to which it should order production of certain medical tests. We therefore recognize that another day may bring questions that will cause this court to refine the analysis in this opinion.

## C.

Finally, we turn to the question of sanctions. The court excluded Dr. Smith's testimony because defense counsel refused to produce the written notes of Dr. Gibbs' examinations of Clifford. Defense counsel persisted in the view that ethical standards governing the psychiatric profession absolutely prohibited disclosure of the psychologist's test notes. To make the grounds for its ruling clear, the trial court stated for the record that defense counsel declined to have Dr. Gibbs himself testify or to ask that the court request or order Dr. Gibbs to produce the protocols. Defense counsel did not object to the trial court's characterization of her conduct.

We conclude that a party's failure to produce the basis for proffered expert testimony when ordered by the court to do so can be a sufficient ground to exclude the testimony. The decision to exclude expert testimony for failure to produce its basis, like the decision to order production of the basis, is discretionary and will be reversed only for abuse of discretion. *Cf.* Super.Ct. Crim.R. 16(d)(2) (stating trial court may "prohibit the party from introducing evidence not disclosed, or it may enter such other orders as it deems just" if party fails to comply with discovery request under the rule). When determining the appropriate response for a party's failure to produce records after the court has determined that production is appropriate, the trial court should consider: (1) "the reasons for the nondisclosure;" (2) "the impact of the nondisclosure on the trial of the particular case;" and (3) "the impact of a particular sanction on the proper administration of justice in general." *Lee v. United States,* 385 A.2d 159, 163 (D.C.1978) (setting out standards for exercise of discretion in sanctioning violations of Rule 16 discovery) (citations omitted).

The right of a criminal defendant to call witnesses is, however, a fundamental right guaranteed by the sixth and fourteenth amendments; the exclusion of a defense witness therefore raises serious constitutional concerns to which the trial court must be sensitive. *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967); *Williams v. Florida,* 399 U.S. 78, 83 n. 14, 90 S.Ct. 1893, 1897 n. 14, 26 L.Ed.2d 446 (1970); *Bassil v. United States,* 517 A.2d 714, 716–17 (D.C. 1986). The constitutional right to call witnesses in one's favor, like the right to cross-examine adverse witnesses, "is not absolute and may, in appropriate circumstances, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973). Exposing the basis of expert testimony to promote effective cross-examination of opinion witnesses is a legitimate state interest that in appropriate circumstances may override the criminal defendant's right to call witnesses of his or her choice. Without attempting to delineate a general rule for determining when exclusion of expert testimony is permissible under the sixth amendment, we conclude that in the circumstances of the present case the trial court did not overstep constitutional bounds in sanctioning Clifford's unwillingness to produce the test protocols.[9]

9. Several courts have faced a similar question when reviewing the exclusion of witnesses following a criminal defendant's failure to meet the demands of pretrial discovery rules. *See Smith v. Jago,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) (White, J., dissenting from denial of certiorari). The fifth circuit has held that "the compulsory process clause of the sixth amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants." *United States v. Davis,* 639 F.2d 239, 243 (5th Cir. Unit B 1981). Other courts have eschewed such an absolute rule in favor of a case-by-case balancing test, weighing the defendant's interest in presenting the evidence against the state interest in enforcing the particular discovery rule through exclusion of the evidence. *See, e.g., United States ex rel. Enoch v. Hartigan,* 768 F.2d 161 (7th Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986); *Fendler v. Goldsmith,* 728 F.2d 1181, 1187 (9th Cir.1984) (citing cases). *See also Perry v. Rushen,* 713 F.2d 1447 (9th Cir.1983) (holding that exclusion of testimony as collateral and of speculative relevance did not violate defendant's sixth and fourteenth amendment rights), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

Three considerations persuade us that exclusion of Dr. Smith's testimony, rather than imposing some lesser sanction, did not violate Clifford's sixth amendment rights and constituted a sound exercise of the court's discretion. First, although it is not clear whether Clifford possessed the protocols, the court excluded Dr. Smith's testimony after Clifford's attorney refused even to ask either Dr. Smith or Dr. Gibbs to produce them; thus, the court asked nothing of Clifford or his counsel that was not immediately within their power to do, and the decision not to produce or seek to obtain the protocols was wilful and deliberate. Second, defense counsel's refusal to produce the protocols constituted not merely a delay in disclosing information but a refusal ever to produce the protocols. When a party altogether refuses to cooperate, the power to exclude testimony as a final sanction is a necessary corollary of the power to compel disclosure of the basis of an expert opinion. Had Clifford's failure to disclose information been negligent, accidental, or beyond his control, or had he merely failed to produce the test protocols by a certain number of days before trial, then total exclusion of the testimony might have violated the sixth amendment. *Cf. United States ex rel. Enoch v. Hartigan,* 768 F.2d 161, 163 (7th Cir.1985) (exclusion of defense witness for late disclosure of intention to call witness violated sixth amendment where no evidence of bad faith and brief recess would prevent any prejudice to government from surprise), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986). Here, the decision not to seek production of the protocols was intentional and final.

Finally, the trial court's skepticism about Dr. Smith's proffered testimony—skepticism that was not unreasonable—was a valid consideration in determining not only the government's need for the protocols but also whether the refusal to produce the protocols justified exclusion of the testimony. We wish to make clear, however, that the trial court's doubts about the certainty of Dr. Smith's conclusions would not themselves have justified excluding the testimony. Expert evidence must derive from a science or art sufficiently advanced to permit its practitioners to reach "a reasonable opinion" about the matter in question; outright speculation may be excluded as not helpful to the jury, as more prejudicial than probative, or as too likely to confuse the jury. *Dyas,* 376 A.2d at 832 (quoting E. CLEARY, ET AL., McCORMICK ON EVIDENCE § 13 (2d ed. 1972)); *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 367–68 (D.C.1980); *Ibn-Tamas,* 407 A.2d at 637–39; *Douglas,* 386 A.2d at 296. Dr. Smith's proffered testimony, however, was not purely speculative; he administered standard tests, rendered the same kind of psychological evaluation the Supreme Court has approved in determinations of future dangerousness (although he reached the conclusion that Clifford does not have a sociopathic personality), and appeared willing to explain his conclusions in scientific terms. *See Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). Short of pure speculation, the degree of certainty with which a particular expert witness proffers an opinion goes to the weight of the testimony, not to its admissibility, and the weight to be given an expert opinion is for the jury to decide. *Sponaugle,* 411 A.2d at 367 (stating that expert opinion "is properly received so long as it is not a mere guess or conjecture"); *United States v. Brady,* 595 F.2d 359, 363 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Oaxaca,* 569 F.2d 518, 526 (9th Cir.), *cert. denied,* 439 U.S. 926, 99 S.Ct. 310, 58 L.Ed.2d 319 (1978). In particular, for an opinion to be admissible, an expert need not state that he or she holds the opinion to a "reasonable scientific certainty." *United States v. Cyphers,* 553 F.2d 1064, 1072 (7th Cir.), *cert. denied,* 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977); *State v. Woodbury,* 403 A.2d 1166, 1170 (Me.1979). A rule of admissibility demanding a greater level of self-proclaimed certainty on the witness' part would remove

from the jury its role in weighing the evidence.[10]

### III.

■ Clifford also contends the trial court committed reversible error by delivering the following jury instruction:

> The defendant has a right to become a witness in his own behalf. His testimony should not be disbelieved merely because he is the defendant. In weighing his testimony, however, you may consider the fact that the defendant has a vital interest in the outcome of this trial. You should give his testimony such weight as in your judgment it is fairly entitled to.

The instruction given by the trial court is virtually identical to Criminal Jury Instructions for the District of Columbia, No. 2.27 (3d ed. 1978). Clifford argues the "vital interest" sentence was itself so prejudicial as to constitute reversible error in the circumstances of this case.[11]

Instructions singling out the defendant and specifically identifying the defendant's interest in the trial have received a good deal of criticism. *See, e.g., United States v. Saletko,* 452 F.2d 193, 197–98 (7th Cir. 1971), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972); *Taylor v. United States,* 390 F.2d 278, 284–85 (8th Cir.), *cert. denied,* 393 U.S. 869, 89 S.Ct.

155, 21 L.Ed.2d 137 (1968); *but see Reagan v. United States,* 157 U.S. 301, 304–06, 15 S.Ct. 610, 611–12, 39 L.Ed. 709 (1895) (upholding a very strongly-worded vital interest instruction). Agreeing with then Judge Blackmun, as a general rule, "[w]e would prefer that the defendant not be singled out" but instead "were included by reference in the court's general instructions as to all witnesses." *Taylor,* 390 F.2d at 285. Alternatively, an instruction adverting to the defendant's vital interest could be more appropriately given if there are vital interests of various government witnesses that also can be mentioned, such that the jury would not perceive that the defendant has been singled out.

Nevertheless, the instruction given here was well balanced and very mild. It was not inflammatory and did not suggest the defendant should not be believed. It stated no more than what should be obvious to common sense. *See United States v. Bear Killer,* 534 F.2d 1253, 1260 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976). Nor did the court warn the jury about the defendant while remaining silent about other witnesses with equally strong personal interests in the outcome. *See United States v. Reid,* 410 F.2d 1223, 1227–28 (7th Cir.1969) (finding reversible

---

**10.** Our dealing here with the admissibility of an expert opinion contrasts with the question of the sufficiency of an expert's opinion to prove an element of a claim or defense. Where "an essential element[ ] of proof can only be shown through expert testimony, there is good reason for courts to take steps to assure that reliable opinions are given." *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 368 (D.C.1980). Thus, we have recently stated that when an expert's opinion is necessary to prove the element of causation in a negligence suit, the expert must be able to state an opinion, "based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries." *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986) (citing *Fitzgerald v. Manning,* 679 F.2d 341, 351 (4th Cir. 1982)). This standard of "reasonable" medical certainty, reflects an objectively well founded conviction that the likelihood of one cause is greater than any other; it does not mean the expert is "personally certain" of the cause, *id.,* or that the cause is discernible to a certainty.

**11.** Clifford also argues the trial court erred in believing it had to read the "vital interest" sentence of this instruction if it was to read the first two sentences explaining that the defendant is not automatically incompetent; the trial court, then, failed to exercise its discretion to shape the jury instructions to the particular case. The court did say that the first part of the instruction was necessary because "some jurors might think that a defendant is not a competent witness" and that "the entire instruction does have to be given." The court's meaning in saying the entire instruction had to be given is not clear, and the discussion quickly passed on to other instruction questions with no further discussion or objection by defense counsel to elucidate the court's reason for including the "vital interest" sentence. In these circumstances, we decline to conclude the court failed to exercise its discretion. Under the circumstances, a plausible explanation is that the court thought the vital interest portion "had" to be given along with the first portion in the sense that it *ought* to be given to prevent the jury from concluding the judge thought it ought to ignore any possible bias.

error in giving vital interest instruction about defendant while failing to warn jury against prosecutor's claims that government informers were as such specially trustworthy). Thus, the instruction given here "was not so harmful to the defendant in this case as to warrant reversal." *Saletko*, 452 F.2d at 198.

*Affirmed.*