In re Tommie Lee MELTON, Appellant.

No. 85–1589.

District of Columbia Court of Appeals.

Argued Jan. 26, 1989.
Decided Nov. 6, 1989.

Harry J. Fulton, Public Defender Service, with whom James Klein, and Laurie B. Davis, Public Defender Service, were on the brief, for appellant.

Janet L. Maher, Asst. Corp. Counsel, with whom Frederick D. Cooke, Corp. Counsel at the time the brief was filed, Charles L. Reischel, and Ann O'Regan Keary, Deputies Corp. Counsel, were on the brief, for appellee.

Before FERREN and SCHWELB, Associate Judges, and MACK,* Associate Judge, Retired.

FERREN, Associate Judge:

Tommie Lee Melton appeals his civil commitment after a jury trial. He claims that, in allowing in evidence the expert opinion testimony of two psychiatric witnesses, the trial court abused its discretion by summarily rejecting appellant's objections to (1) the psychiatrists' reliance on hearsay evidence as the basis for their expert opinions and (2) the qualifications of the psychiatrists themselves to render expert opinions about Melton's dangerousness.[1] Because not all

---

* Judge MACK was an *Associate Judge* of this court at the time of argument. Her status changed to *Associate Judge, Retired,* on October 1, 1989.

1. In the alternative, Melton argues that the evidence adduced at trial, including the opinion testimony, was insufficient for a jury to find by clear and convincing evidence that he was dan-

hearsay can be reasonably relied upon as a basis for expert opinion testimony, and because not all psychiatrists are necessarily qualified to provide expert testimony on a person's dangerousness, we agree that the trial judge abused his discretion in admitting in evidence the opinion testimony of the two psychiatrists without addressing appellant's objections. Accordingly, we reverse and remand.

## I.

On July 11, 1985, Dr. Antoine Cornet, a staff psychiatrist at Saint Elizabeths Hospital's Spring Road Mental Health Clinic, hospitalized Melton involuntarily at Saint Elizabeths pursuant to an application for emergency hospitalization, D.C.Code § 21–521 (1989 Supp.). The hospital detained Melton for about a week, *id.* §§ 21–521 to 21–528 (1989 Supp.), and then extended the detention by filing a judicial hospitalization petition seeking civil commitment for an indeterminate period, *id.* § 21–541 (1989 Supp.). The Commission on Mental Health held a hearing on the petition on August 5, 1985, *id.* § 21–542 (1981). In its Report and Recommendations to the Superior Court issued on August 12, the Commission found that Melton was mentally ill and likely to injure himself or others and recommended his commitment as an outpatient at Saint Elizabeths' Spring Road Clinic.[2] Melton requested a de novo jury trial, which began on October 17, 1985, and lasted three days. At trial, Saint Elizabeths presented two witnesses, Dr. James Byrd, the administrator and psychiatrist on the ward where Melton was detained, and Dr. Cornet. Melton presented no witness-

es. The jury found Melton mentally ill and a danger to himself or to the community, and on October 23, 1985, the trial court ordered Melton's indefinite commitment to the Spring Road Clinic for treatment as an outpatient.

## II.

■ On appeal, Melton claims the trial court committed reversible error by admitting in evidence the expert opinion testimony of Drs. Byrd and Cornet, both of whom testified that he was mentally ill and likely to injure himself or others.[3] Melton contends, first, that the trial court abused its discretion in summarily rejecting his objection to the hearsay basis for the psychiatrists' opinions. The testimony of Drs. Byrd and Cornet encompassed both fact and opinion, presented in an intermittent fashion. The doctors testified as to their own observations of Melton's mental condition and based their conclusions that he was mentally ill on these observations, as well as on hearsay diagnoses recorded or related to them by other doctors. But, as for Melton's dangerousness to self or others, the doctors presented almost no direct evidence to support their opinions. Instead, they based their opinions that Melton was dangerous almost entirely on incidents of dangerous conduct, allegedly seen by lay observers, which had been related orally to the doctors or recorded in medical records. We agree with Melton that the trial judge's decision to admit the hearsay testimony over appellant's objection, absent a finding that such testimony was reasonably relied upon by the psychiatrists as a

gerous to self or others as a result of his mental illness. In view of our disposition we need not address this issue.

2. More specifically, the Commission found that Melton "suffers from Schizophrenia, Undifferentiated Type with Substance Abuse, Chronic by reason of which he is dangerous to himself and to others."

3. At trial, counsel for appellant objected only to Dr. Byrd's testimony on the grounds raised in this appeal. At oral argument on appeal, counsel contended that these objections, concerning the admission of hearsay evidence and the qualifications of the psychiatrists to render opinions

on dangerousness, should extend to the testimony of the second psychiatrist to testify at trial, Dr. Cornet. Under the unusual circumstances of this case, in which the trial judge declined meaningfully to entertain these matters—clearly indicating that he rejected the arguments raised by the objections—we believe any further objection on these grounds with respect to Dr. Cornet's testimony would have been useless and arguably counter to appellant's interests. Accordingly, we agree with appellant that his objection to Dr. Byrd's opinion was sufficient to preserve for appeal the objection to both psychiatrists' testimony.

basis for their opinions, was an abuse of discretion.

### A.

The hospital's first witness at trial was Dr. Byrd, whom the trial court accepted as an expert in the diagnosis and treatment of mental health.[4] Dr. Byrd testified that he had known Melton since Melton's admission to Saint Elizabeths on July 11, 1985, was "quite familiar" with the medical records pertaining to Melton's most recent admission, and had "reviewed" the most recent records pertaining to Melton's last several admissions.[5] He then proceeded to offer his opinion—based on his review of the hospital records and his discussions with other hospital staff members, as well as on his observations of Melton[6]—that Melton suffered from "chronic undifferentiated schizophrenia with strong aspects of a paranoid tendency." Counsel for the hospital next asked Dr. Byrd whether his opinion was affected in any way by his knowledge of the specific circumstances leading to Melton's July 11 admission to Saint Elizabeths. Melton's counsel immediately objected to any explanation of these events. The court overruled the objection. After Dr. Byrd testified that he had diagnosed Melton based on his own observations of Melton while Melton was on the ward and "didn't need outside evidence to substantiate that," hospital counsel again asked him to describe the events leading up to Melton's hospitalization. Melton's counsel objected once again to testimony about these events, stating that such evidence would be hearsay. The following colloquy then occurred:

> THE COURT: Of course, it's hearsay. Of course it's hearsay. It's an exception, however, Mr. Fulton [Melton's counsel]. Go ahead, Doctor.
>
> MR. KELLY [Hospital's counsel]: It certainly is, Your Honor.
>
> THE COURT: Mr. Fulton, please be seated. Go ahead.
>
> MR. FULTON: If I might, Your Honor, could we come to the bench?
>
> THE COURT: Mr. Fulton, no. We won't get the case started. We'll never get started at the rate we're going. Go ahead, Mr. Kelly.

Over three objections, therefore, and without identifying the source of the information, Dr. Byrd proceeded to provide the following hearsay testimony concerning "what [Melton] had done right before he came into the hospital":

> He is living with his mother and he became upset with her. He became impulsive and lost control of his temper which is a characteristic of a schizophrenic. And he punched his mother in the nose and became very angry with her and was threatening to poison her.
>
> She became very frightened and called up Dr. Cornet, who was following Mr. Melton on an out-patient basis. And Dr. Cornet went to the home, asked Mr. Melton to sign himself into the hospital vol-

---

**4.** Dr. Byrd had been the ward administrator of the Acute Admission Ward at Saint Elizabeths Hospital for approximately four months at the time of his testimony. He received his medical degree from the Medical University of South Carolina in 1979 and completed a five-year residency in psychiatry at Saint Elizabeths in June 1985. Dr. Byrd also had been engaged for ten years in psychopharmacology research. Dr. Byrd estimated that he had testified as an expert in the diagnosis and treatment of mental health six times before the Superior Court, more than twenty-five times before the Mental Health Commission, and twice in Virginia. Dr. Byrd was not Board certified as a psychiatrist but was eligible to sit for the exam.

**5.** On the basis of the hospital records, which were not entered directly in evidence, Dr. Byrd testified that Melton had been admitted to Saint Elizabeths Hospital eleven times. On cross-examination, Dr. Byrd admitted that he had only reviewed the discharge summaries of the old hospital records and was most familiar with the present record. Later in his cross-examination, Dr. Byrd testified that Melton had been voluntarily admitted to Saint Elizabeths a number of times, and on redirect he testified that while he could not recall the exact number, all but one of the admissions had resulted in voluntary placements. Dr. Byrd also acknowledged that Melton had maintained himself voluntarily as an outpatient for more than two years, from 1979 to 1982.

**6.** On cross-examination, Byrd admitted that he had never conducted a private examination of Melton. On redirect, he stated that he had had several talks with Melton.

untarily to receive treatment. And Mr. Melton said that he had no mental illness and that he had no interest at all in signing himself into the hospital for voluntary treatment.

At which point his mother was once again forced to call the police to have Mr. Melton brought into the clinic so that they could bring him to the hospital as an emergency.[7]

Melton's mother, the alleged victim of Melton's punch, was not called to testify concerning the alleged incident, even though she was present at trial for at least one day during the proceedings.

Dr. Byrd next described Melton's behavior on the hospital ward.[8] He stated that Melton had "a hard time dealing with his feelings of dependency on his mother" but that, once he was away from her and in a controlled environment on medication, he "rapidly became very calm and seclusive," a course typical of schizophrenics who have difficulty with close relationships. According to Dr. Byrd, Melton was "relatively passive" and cooperative; he would "sit around the ward most of the day," thinking or reading books on religion, and would occasionally chat with other patients. On a few occasions, however, Melton displayed "impulsive, explosive verbal outbursts" when asked to do something he did not want to do. Dr. Byrd testified that Melton "was able to bathe himself and dress appropriately and was eventually ready to be returned home."

Dr. Byrd continued to testify, relaying facts and opinion, without indicating the sources of his data. Melton was released for outpatient treatment September 3, 1985, and was required to report to the Spring Road Clinic once every two weeks for an injection of prolixin, an anti-psychotic medication. According to Dr. Byrd, the medication resulted in "a substantial improvement" in Melton's condition, as compared to "the way that he presented himself to the hospital, completely disheveled, extremely untidy, extremely dirty, having not bathed for weeks, urinating in his bedroom." Dr. Byrd stated that Melton had superficial insight into his mental illness.[9] Although Dr. Byrd already had testified that he had only reviewed the history of Melton's most recent admissions to the hospital, he maintained at trial that Melton "had not been able to follow his treatment for the past ten [to] fourteen years." According to Dr. Byrd, with some prodding and encouragement Melton had been able to say that he needed medication, but he had not been able to follow through. Dr. Byrd opined, "If he misses one or two injections, he will be right back to where he started from which is psychotic and threatening and assaultive and very bizarre and delusional."

Counsel for the hospital next asked Dr. Byrd to relate details of Melton's non-compliance with treatment during previous admissions to the hospital. The trial court, after sustaining Melton's counsel's objec-

---

7. The following day, on cross-examination, Dr. Byrd testified that the basis for his knowledge that Melton had hurt his mother was a conversation he had had with her. Dr. Byrd also admitted that he had not been on the scene of the fight, investigated the event, or recorded it in Melton's medical records. Dr. Byrd stated that he presumed Melton's mother had told the truth when she related the incident to him. Dr. Byrd also stated on cross-examination that Melton's medical records indicated that Melton had been living with his mother more or less throughout his adult life and that intermittent friction had characterized their relationship throughout the time period covered by the records.

8. On redirect the following day, Dr. Byrd stated that, aside from his conversation with Melton's mother, all other reports of Melton's conduct

came from his review of medical records written by psychiatrists who had personally treated Melton.

9. Dr. Byrd acknowledged on cross-examination that a week before the judicial hearing, Melton had come to Saint Elizabeths seeking voluntary hospitalization because "his mother was being crabby." Dr. Byrd stated that all he knew about the circumstances was what he had read from a brief note in the record, which indicated that Melton wanted to come back into the hospital for two or three weeks for rest and to settle down. Dr. Byrd explained that this behavior did not indicate insight but "dependency" on the hospital. Saint Elizabeths refused to admit Melton; "they were trying to keep him out of the hospital at all costs." Dr. Byrd revised his testimony concerning Melton's superficial insight to state that Melton had "no consistent insight."

tion that Dr. Byrd already had testified that he had not reviewed the records from earlier admissions, limited Dr. Byrd to discussing the 1985 admissions for which he had read the medical records. Dr. Byrd testified that Melton's admission from November 1984 through January 1985 was representative of all the admissions in that he had threatened to hurt his mother. Dr. Byrd remarked, "I believe on that one he has assaulted his mother." When Melton's counsel objected to Dr. Byrd's testifying as to his belief, rather than his knowledge, Dr. Byrd responded that he needed to review the medical records. He then stated, "Okay. On this particular one he hadn't actually assaulted. That was another one. On this one here ... he threatened to kill his mother and was taken into custody by police and brought to St. Elizabeths as an emergency." Dr. Byrd testified that Melton had been treated in January 1985 in the same manner as in his July 1985 admission. On that earlier occasion, the hospital had discharged Melton against medical advice after he left the hospital to go to Florida to live with his sister.[10]

Counsel for the hospital next asked Dr. Byrd for his opinion as to whether Melton would be dangerous to himself or others if he were to be "released." Dr. Byrd answered that such injury was "quite likely." He stated that the basis for his opinion about Melton's dangerousness was as follows:

I think the best predictor of the future is his past track record here, and his track record has been one of repeated emergency admissions.... On one of his admissions he came in because he threatened to set himself on fire. Another one he came in and he jumped out of a moving car on the way to the hospital. I think the man, when he gets sick and he gets off the medication, he is likely to hurt himself.

Dr. Byrd was then asked if there were any other basis for his opinion, and he responded:

Similar incidents where he threatened to stab his sister with a knife and things like that. Excuse me, with a screwdriver. And the record has numerous examples of this sort of thing.[11]

Dr. Byrd further stated that if Melton were "released now and doesn't have any follow up care, he'll go back to the same pattern of living with his mother and decompensating and becoming psychotic, threatening to kill her. And one of these days...." He concluded by stating that the basis for his opinion concerning Melton's dangerousness to others also supported his opinion that Melton was likely to hurt himself.

### B.

The hospital's second and final witness was Dr. Antoine Cornet, whom the court accepted as an expert witness in the diagnosis and treatment of mental health.[12] He

---

**10.** Later, during cross-examination, Dr. Cornet testified on the basis of medical records that Melton was in Florida from April to July and that, while in Florida, Melton had sought out psychiatric care and was self-medicated.

**11.** On cross-examination, Dr. Byrd stated that he presumed the truth of these incidents because "[w]ith all the multiple people documenting that I do presume that there aren't many liars on that." In his closing argument to the jury, counsel for the hospital reminded the jurors that Melton's hospital records indicated that "Melton had engaged in violent conduct in the past, conduct involving threatening behavior toward his sister, conduct involving threatening behavior toward himself with respect to possibly trying to set himself on fire." In the rebuttal portion of closing argument, counsel again referred to these incidents, stating that Dr. Byrd's review of the record "showed that Mr.

Melton had on earlier occasion, according to the doctors who entered those records, ... tried to assault his sister, tried to jump out of the moving car, tried to set himself on fire, tried to assault his mother." Hospital counsel then informed the jury that these incidents were not evidence but facts in the medical records for them to consider as factors affecting the doctors' diagnoses. He told the jurors:

Just as if you were in a hospital and there was an entry in the record that you were allergic to a particular drug or that you had had a particular condition in the past, the doctor ... trying to treat you[ ] needs to know of that in reaching his diagnosis because it could be very relevant to his diagnosis.

**12.** Dr. Cornet had been employed at the Spring Road Clinic since July 1985. He received his medical degree from Haiti College in 1974, had been a psychiatric resident at Saint Elizabeths

testified that he had first met Melton on July 8, 1985, when Melton voluntarily appeared at the Spring Road Clinic. Melton, according to Dr. Cornet, has "a very good relationship with the staff over there." He had come back to the clinic on his return from Florida after his mother had alerted the staff about his return and a nurse had convinced him to come in.[13] When Melton arrived at the clinic, the staff bathed him because, according to Dr. Cornet, his personal hygiene was "terrible." Dr. Cornet testified that he had talked to Melton only briefly because Melton "was not in the mood to have any kind of evaluation" but was talking a lot, "making jokes and talking to everybody." Because Melton was not showing any sign of violence, the doctor prescribed anti-psychotic medication and a staff member took him home.[14]

In accordance with the clinic's practice, the following day a staff member went to Melton's home to pick him up and bring him to the clinic. According to Dr. Cornet, who spoke with Melton for thirty minutes on July 9, Melton had become more coherent and his behavior was more appropriate.[15] Dr. Cornet also gave Melton a physical examination and discovered many bruises on his skin. Dr. Cornet stated that he learned from Melton's medical records and from the patient himself that Melton was a diabetic, taking Orinese to keep his blood sugar down. Dr. Cornet testified that he also learned that Melton had glaucoma and told Melton how to take care of it. Dr.

Cornet prescribed additional anti-psychotic medication and sent Melton home. Dr. Cornet also testified that on July 9 a staff member had discovered at Melton's house a container full of medication which Melton had not consumed. Dr. Cornet said that the bottle contained both Melton's anti-psychotic medication and his diabetes pills.

According to Dr. Cornet, on July 10 Melton's mother called the clinic and told a staff member that Melton had been "really disruptive." Dr. Cornet was not at the clinic at this time but learned of the call and subsequent events at the staff conference that evening. Melton's mother requested that Melton be taken to the hospital immediately because "he was very disruptive." A staff member went to the house to investigate but, because Melton was not disruptive while he was there, returned to the clinic.

On July 11 at about 9:00 a.m., Melton's mother called the clinic. According to Dr. Cornet, "she said she cannot stay with Tommie any more because he was very disruptive and assaultive toward her and she would like something to be done immediately." After the hospital counsel asked for specifics, Dr. Cornet stated, "She said Tommie had punched her in the nose."[16] Dr. Cornet asked two staff members to accompany him to the house to observe the situation.[17] When they arrived two hours later, Melton "was very restless, talking incoherently, being belligerent, not willing

Hospital from 1979 to 1982, and had completed neurology training at Howard University. Dr. Cornet stated that he was a neuropsychiatrist, eligible to sit for Board certification in both psychiatry and neurology. He added that he had testified as an expert in the diagnosis and treatment of mental health twice in Superior Court and at least three times before the Mental Health Commission.

**13.** Dr. Cornet noted that a nurse had informed him of these events.

**14.** On cross-examination, Dr. Cornet stated that his note in the medical records concerning his examination of Melton on July 8, 1985, indicated that he had found Melton to be in no acute physical, medical, or psychiatric distress.

**15.** Dr. Cornet testified on cross-examination that his medical notes from July 9, 1985 indi-

cated that Melton was cooperative and displayed "no active psychosis." On redirect, the doctor explained that "active psychosis" meant that the patient was "on edge to do something which could be detrimental either to himself or to somebody else."

**16.** On cross-examination, Dr. Cornet admitted that although he had written in the petition for emergency hospitalization that Melton had punched his mother, he had never written in Melton's medical records that Melton had struck his mother. In his closing argument to the jury, counsel for the hospital reminded the jurors that Melton's mother had told Dr. Cornet that Melton had punched her in the nose.

**17.** Dr. Cornet admitted on cross-examination that his testimony before the Mental Health Commission had indicated that on July 11, 1985 Melton had come to the clinic himself.

to talk to anybody." Dr. Cornet described the mother as "pretty upset." According to Dr. Cornet, she said that Melton had punched her in the nose the day before, and when he started acting out again that morning, she was afraid something similar might happen, so she called the clinic. According to Dr. Cornet, based on conversations with Melton's mother after the incident, the two had a "strenuous relationship" and had been experiencing tensions over money problems. Asked on direct examination if Melton's mother showed any physical sign of having been engaged in a scuffle, Dr. Cornet answered that he "did not examine her." Dr. Cornet tried to convince Melton to come to the hospital voluntarily, but he refused; he was, according to Dr. Cornet, "very belligerent." Dr. Cornet asked the mother to leave the house, but she refused. Because Melton was "getting higher and higher," Dr. Cornet called the police. According to the doctor's testimony, the police apologetically took Melton to Saint Elizabeths hospital, and he "did not resist." [18]

When asked if he had formed an opinion concerning Melton's mental health, Dr. Cornet responded that he believed Melton was schizophrenic. He stated that if Melton discontinued his bi-monthly injections of medication, he would become "disorganized again." Dr. Cornet further testified that at the time of trial Melton had "some good appreciation" of his need to take medication. He also stated that Melton had complied "very well" with meeting appointments for his medication because of the clinic's "aggressive" policy of picking up patients for treatment at the clinic. The doctor doubted, however, that Melton would take his medication "by mouth" if expected to do so on his own.

Hospital counsel asked Dr. Cornet whether Melton was likely to injure others "if released from medical care at this time." Dr. Cornet answered:

Based upon his history, by the time I got him he wasn't under psychiatric care.

He did have an incident, an incident in which he punched his mother. In other words, yes, he did injure somebody sort of fact [sic]. And chances are it is likely that something like that might happen again if he is not receiving the proper psychiatric care.

When asked whether Melton was likely to injure himself "if he were to quit receiving medical care at this time," Dr. Cornet continued:

He had the tendency to be very belligerent when he was getting very sick. And he is likely to be belligerent and he might be the target of an attack on the street or at home.

## C.

The decision whether to admit expert testimony lies within the broad discretion of the trial court, and we will reverse only for an abuse of discretion. *See Coates v. United States*, 558 A.2d 1148, 1152 (D.C. 1989); *Clifford v. United States*, 532 A.2d 628, 631 & n. 2 (D.C.1987). This court has permitted psychiatrists and psychologists to offer opinions based on reports not in evidence if such reports are customarily relied upon in the practice of their profession. *See Clifford*, 532 A.2d at 632 (psychologist may rely on test protocols taken by another psychologist); *In re Gahan*, 531 A.2d 661, 665–66 & n. 7 (D.C.1987) (psychiatrist may base opinions on patient's history of suffering from severe hydration and weight loss recorded in medical records); *In re Samuels*, 507 A.2d 150, 152–53 (D.C.1986) (psychiatrist may consider incidents of abberant behavior observed and recorded by other psychiatrists in diagnosing mental illness and dangerousness). We have noted that the law in this jurisdiction concerning the permissible bases for expert opinions is consistent with Rule 703 of the Federal Rules of Evidence, which states:

The facts or data in the particular case upon which an expert bases an opinion or

---

18. Dr. Cornet also related that in August 1985 he had delayed Melton's release from Saint Elizabeths for at least two or three weeks because he wanted Melton not to return to his mother's house but rather to live independently in a private boarding house. However, after living for two weeks in the boarding house, Melton moved back in with his mother.

inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

See *L.C.D. v. District of Columbia*, 488 A.2d 918, 921 n. 8 (D.C.1985) (citing S.W. GRAAE, DISTRICT OF COLUMBIA STATUTORY AND CASE LAW ANNOTATED TO THE FEDERAL RULES OF EVIDENCE ¶ 7.9 (1976)). Accordingly, evidence, such as hearsay, that would not otherwise be admissible may be admitted at trial for the limited purpose of explaining the basis for the expert opinion but may not be admitted for the truth of the evidence on which the expert relies.[19] S. SALTZBURG & K. REDDEN, FEDERAL RULES OF EVIDENCE MANUAL 671 (4th ed. 1986); *see also Samuels*, 507 A.2d at 153–54 & n. 5 (affirming limiting instruction, but noting that court's instruction that medical notations are admissible only for evaluation of psychiatrist's opinion and not for truthfulness of notations themselves presents "troublesome distinction").

It follows that, before a trial judge may rule on an objection to an expert's reliance on otherwise inadmissible hearsay as the basis for opinion testimony under Rule 703, the judge must make a factual inquiry to determine whether the type of hearsay at issue is "reasonably relied upon by experts in the particular field." *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1243 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 703[03], at 703–16 (1988).

According to the Advisory Committee's Notes to Rule 703, "the rule is designed to broaden the basis for expert opinions be-

yond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court." S. SALTZBURG & K. REDDEN, at 687. The paradigmatic case for the application of the rule is a physician offering an incourt diagnosis of a physical ailment based on hearsay evidence. As explained in the Advisory Committee Notes:

[A] physician in his [or her] own practice bases his [or her] diagnosis on information from numerous sources and of considerable variety, including statements by, patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His [or her] validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

*Id.* (citations omitted). Therefore, although the doctor's opinion may be subjected to cross-examination to assess its reasonableness or correctness based on the information available to the doctor, Rule 703—when properly invoked—deems the underlying type of information itself reliable enough for use by the expert to preclude any need for testing in court the perceptive powers, memory, and sincerity of the sources of that information. Note, *Hearsay Bases of Psychiatric Opinion Testimony: A Critique of Federal Rule of Evidence 703*, 51 S.CAL.L.REV. 129, 145–46 (1977) (hereafter Note, *Hearsay Bases*); *see also State v. Schreuder*, 726 P.2d 1215, 1223 (Utah 1986) ("Rule 703 assumes that the particular facts relied on will be trust-

---

**19.** This court also has written that FED.R.EVID. 705 is consistent with the caselaw in this jurisdiction. *See Clifford*, 532 A.2d at 633. FED.R. EVID. 705 provides:

The expert may testify in terms of opinion or inference and give his [or her] reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be re-

quired to disclose the underlying facts or data on cross-examination.

In the present case, the trial court instructed the jury that Drs. Byrd and Cornet had testified as to information provided by other individuals and that these statements were to be considered not as actual proof of the incidents described but as a basis for evaluating the reasonableness and correctness of the doctors' conclusions.

worthy because the integrity and specialized skill of the expert will keep him or her from basing his or her opinion upon questionable matter."). The question, then, becomes whether there are any limitations on an expert's reliance on facts or data under Rule 703.

While the hearsay relied on for a wholly medical diagnosis—objective tests, opinions and reports of disinterested medical personnel, and observations of symptoms made by persons vitally interested in the health of the patient—contain strong indicia of inherent reliability, not all information that forms the basis for expert opinion has the same level of innate trustworthiness, especially information from lay witnesses commonly relied on for mental health diagnoses. *See In re Richardson*, 481 A.2d 473, 480 (D.C.1984) (friends or relatives may distort information provided to hospital staff concerning a patient's need for hospitalization); *People v. LaLone*, 432 Mich. 103, 105, 437 N.W.2d 611, 613 (1989) (psychological patients more likely to lie concerning their condition than medical patients). Nor, in considering available information, does an expert always count on its veracity. *See* S. SALTZBURG & K. REDDEN, at 670 ("experts may rely on data for some purposes without making any claim that the data is very accurate").[20] Commentators have noted, for example, that psychiatrists are trained to assimilate information from a wide variety of sources, are "perfectly aware" that patients' clinical histories can be "distorted and self-serving," and know that information from family members "may have relatively little validity." *Diamond & Louisell, The Psychiatrist as an Expert Witness: Some Ruminations and Speculations*, 63 MICH.L.REV. 1335, 1353 (1965). Psychiatrists and psychologists, therefore, consider valuable for purposes of diagnosis and treatment any and all information provided them by patients and their relatives, whether or not the data is true. *See* 4 J.

WEINSTEIN & M. BERGER, ¶ 803(4)[01], at 803–150.

A trial judge undertaking a Rule 703 inquiry in a civil commitment hearing should not assume, therefore, that because a psychiatrist might reasonably rely upon a type of information for certain purposes— *e.g.*, using hearsay statements by relatives about patient behavior to ascertain the state of family relations—that the expert would necessarily rely on that same type of information for purposes of ascertaining the patient's history of dangerous behavior. Thus, the "reasonable reliance" question concerns not only the fact that a particular type of information is used by an expert but also, more significantly, the purposes for which it is used. This means, in practical effect, that the Rule 703 reference to facts or data "of a type reasonably relied upon" includes two components: type of data and reasonableness for purposes used. The rule, therefore, does not refer merely to a generic type or category of information, such as statistical data or hearsay; it refers, more specifically to information of a type *and of a quality* commonly relied upon for the purpose the expert announces. Otherwise, the facts or data cannot be *reasonably* relied upon.

Courts disagree about the criteria trial judges should use for a Rule 703 inquiry to assess whether facts or data are reasonably relied upon by experts in their profession. *See* 3 J. WEINSTEIN & M. BERGER, ¶ 703[03], at 703–18. The United States Court of Appeals for the Third Circuit has indicated that the trial judge should make factual findings "as to what data experts in the field find reliable" and should admit an opinion based on this data, leaving rigorous examination of the assumptions forming the basis for the opinion to cross-examination. *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 277 (3d Cir.1983), *rev'd on other grounds*, 475 U.S.

---

20. A psychiatrist, for example, may accept at face value and act upon the statements of family members concerning a patient's violent behavior for purposes of a 48–hour emergency hospitalization. Although such statements may be recorded in the patient's psychiatric admission records, they are not necessarily reliable enough to form the basis for an opinion that the patient is dangerous to self or others as a result of mental illness and thus should be civilly committed.

574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[21] In so holding, the court reversed a district court decision which had set forth six factors for trial courts to use to arrive at their own, independent assessments of the trustworthiness of the data underlying expert opinions.[22] The district court had not considered " 'as in any way determinative of the issue' " the affidavits of the experts who sought to testify, which stated that the material upon which they had based their opinions was generally relied upon by experts in their fields. *In re Japanese Electronic Products*, 723 F.2d at 276.

In contrast, the United States Court of Appeals for the Fifth Circuit, citing the district court decision in *Japanese Electronic Products*, see *supra* note 22, has held that, although courts should afford experts wide latitude in choosing the sources on which they base their opinions, "Rule 703 nonetheless requires courts to examine the reliability of those sources." *Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir.1983).

Judge Weinstein, in *"Agent Orange" Product Liability Litigation*, appears to have reached an intermediate position, concluding that:

The expert is assumed, if he [or she] meets the test of Rule 702,[23] to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances. Nevertheless, the court may not abdicate its independent responsibilities to decide if the bases meet *minimum standards of reliability* as a condition of admissibility. *See* Fed. R.Ev. 104(a). If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded. Fed.R.Ev. 401, 402.

611 F.Supp. at 1245 (footnote and emphasis added). Thus, in requiring that the information be "of a type reasonably relied upon," Rule 703 "implicitly requir[es] that the information be viewed as reliable by some independent, objective standard beyond the opinion of the individual witness." 3 J. WEINSTEIN & M. BERGER, § 703[03] at 703–25.

While we agree with Judge Weinstein's call for the court to confirm "minimum standards of reliability as a condition of admissibility" of expert testimony under

**21.** *See also Attorney Grievance Comm'n v. Nothstein*, 300 Md. 667, 682–84, 480 A.2d 807, 815–16 (1984) (psychiatrist's characterization of reliance on hearsay data obtained from family and friends of attorney as "forensic" method held sufficient basis for court finding of "reasonable reliance").

**22.** The district court proposed that trial judge consider the following factors under Rule 703:

1. The extent to which the opinion is pervaded or dominated by reliance on materials judicially determined to be inadmissible, on grounds of either relevance or trustworthiness;

2. The extent to which the opinion is dominated or pervaded by reliance upon other untrustworthy materials;

3. The extent to which the expert's assumptions have been shown to be unsupported, speculative, or demonstrably incorrect;

4. The extent to which the materials on which the expert relied are within his [or her] immediate sphere of expertise, are of a kind customarily relied upon by experts in his [or her] field in forming opinions or inferences on that subject, and are not used only for litigation purposes;

5. The extent to which the expert acknowledges the questionable reliability of the underlying information, thus indicating that he [or she] has taken that factor into consideration in forming his [or her] opinion;

6. The extent to which reliance on certain materials, even if otherwise reasonable, may be unreasonable in the peculiar circumstances of the case.

*In re Japanese Electronic Products Antitrust Litigation*, 505 F.Supp. 1313, 1330 (E.D.Pa.1980) (footnote omitted).

**23.** FED.R.EVID. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

District of Columbia courts apply a three-part test, quoted in the text *infra* at page 647, in determining the admissibility of expert testimony. *See Dyas v. United States*, 376 A.2d 827, 832 (D.C.1977) (quoting E. CLEARY, ET AL., MCCORMICK ON EVIDENCE § 13, at 29–31 (2d ed. 1972)), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).

Rule 703, we still face a critical question: If a trial judge is not going to defer completely to experts' own assessments of what they reasonably rely upon or, on the other hand, is not going to undertake a wholly independent review of the sources' reliability, then how is the judge to ascertain whether "minimum standards of reliability" have been met?

■ We conclude that a two-part test will suffice: a trial judge will properly admit expert opinion based on hearsay testimony under Rule 703 when (1) the judge is persuaded that experts in the field commonly rely on the particular type of hearsay information in addressing the specific type of problem raised in the case before the court, and (2) the judge concludes that the information (if not admissible for its truth under an exception to the hearsay rule) is of a type for which the underlying reliability of the data can be sufficiently explored through cross-examination of the testifying expert.[24] Of course, a trial judge should exclude an expert opinion, including the facts and data upon which it relies (even if of a type reasonably relied on most of the time), if admission in evidence "would create a substantial danger of undue prejudice or would mislead the jury." *Douglas v. United States*, 386 A.2d 289, 295 (D.C.1978); *see Ibn–Tamas v. United States*, 407 A.2d 626, 639 (D.C. 1979).[25]

The susceptibility to effective cross-examination of an expert's testimony about the bases for his or her opinions may de-

pend on that expert's knowledge about the methods used to gather the facts upon which the expert relies. For example, an expert who relies on opinions or facts generated by other experts or professionals will probably be familiar with—and in a position to testify about—the techniques and methodologies used by such individuals. The expert may not be able to affirm that a particular event actually occurred, but if the incident has been observed and recorded by professional fact-gatherers, the reliability of the data collection at least can be scrutinized for its conformity with identifiable and regularized standards. Where that is the case, the trial judge can probably be assured by proffered affidavit or by voir dire testimony that " ' "the assumptions which form the basis for the expert's opinion, as well as the conclusions drawn therefrom, [will be] subject to rigorous examination" ' " at trial. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. at 1244 (quoting *Japanese Electronic Products*, 723 F.2d at 277 (quoting *Japanese Electronic Products*, 505 F.Supp. at 1328)). Our own caselaw, in fact, has reflected the logic of such a rule; as noted above, we have approved the admission in evidence of opinions based on physical symptoms recorded in medical charts, *Gahan*, 531 A.2d at 666 n. 7, tests administered by a non-testifying psychologist, *Clifford*, 532 A.2d at 632, and violent behavior observed by non-testifying psychiatrists and recorded in the hospital records.[26] *Samuels*, 507 A.2d at 152–53.

---

**24.** *See* S. Saltzburg & K. Redden, at 671 (in assessing reasonableness of reliance by an expert on facts not in evidence, courts might consider whether opposing party can effectively examine expert concerning the reliability, significance, strengths, and weaknesses of those facts).

**25.** *See also* Fed.R.Evid. 403, which states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**26.** The caselaw of other jurisdictions is consistent with this kind of analysis. *See, e.g., United States v. Bramlet*, 820 F.2d 851, 856 (7th Cir.) (permitting psychologist to base opinion on recorded observations of hospital staff members,

correctional officers, counselors, and nurses; holding "observations recorded by trained ... personnel, are exactly the type of information which the broadened scope of Rule 703 was intended to encompass"), *cert. denied*, 484 U.S. 861, 108 S.Ct. 175, 98 L.Ed.2d 129 (1987); *United States v. Phillips*, 515 F.Supp. 758, 762–63 (E.D.Ky.1981) (admitting expert opinion of psychologist based on nursing notes from mental institution in which defendant was incarcerated and on report prepared by team of forty professionals who had diagnosed defendant); *People v. Lang*, 113 Ill.2d 407, 467, 101 Ill.Dec. 597, 625, 498 N.E.2d 1105, 1132 (1986) (affirming psychiatric opinion based on observations of nurses, social workers, and personnel at hospital where patient received psychiatric treatment); *State v. Recor*, 150 Vt. 40, 549 A.2d 1382 (1988) (upholding psychologist's use of hearsay statements by

Where experts rely on lay observations of behavior or events, however, cross-examining experts about the reasonableness of their reliance on this data may be more difficult.[27] Absent the ability of an expert to testify concerning both the manner in which a lay observer has perceived and recorded certain facts and whether that manner accords with methods of fact-gathering ordinarily relied upon, cross-examination may provide little or no insight into the reliability of the basis for the expert opinion. In such circumstances a trial judge, therefore, may reasonably conclude that a jury will be incapable of performing its function of "determining the appropriate weight to be given to the testimony,"[28] *Japanese Electronic Products,* 723 F.2d at 278, and exclude the expert opinion. *See* Note, *Hearsay Bases,* at 145 ("[A]n opinion can be no better than the hypothesis or assumption upon which it is based.").

We are not stating categorically that expert reliance on hearsay observations by laypersons will always fail to satisfy the second prong of the test set forth *supra* at page 645. But, given the possibility that lay observers in some contexts (*e.g.,* a family with a mentally ill member) may not be disinterested, and given, further, that the expert's inability to vouch for the lay observer's reliability will not necessarily undermine the expert's own aura of authority, a trial court must be very careful to evaluate whether the proffered expert testimony and its underlying sources can be effectively scrutinized before the jury.

Of course, when lay observers themselves testify and are cross-examined at trial, the jury is afforded the opportunity directly to assess the facts and assumptions upon which an expert opinion relies. *See In re Stokes,* 546 A.2d 356, 362–63 (D.C.1988) (plurality opinion) (hospitals should present testimony or affidavits of witnesses, such as family members, with direct knowledge of patient's conduct); *In re James,* 507 A.2d 155, 158–59 (D.C.1986) (suggesting same). *See also National Center For State Courts' Guidelines For Involuntary Civil Commitment,* 10 MENTAL AND PHYSICAL DISABILITY L.REP. 409, 488 (1986) (Guideline F9) (recommending that ordinarily court should hear testimony of at least one person who observed conduct leading to filing of commitment petition).

The importance of judges ensuring the "minimum standards of reliability" of hearsay data is magnified by the difficulty, if not impossibility, of jurors assessing the hearsay only as support for the expert's opinion and not for its truthfulness. *See Samuels,* 507 A.2d at 153 n. 5 (labelling such distinction "troublesome"); Note, *Hearsay Data,* at 145–46 (expert's reliance on hearsay is "implied assertion of belief in the truth of the bases"). As we recognized in *Ibn–Tamas,* 407 A.2d at 632, "because expert ... testimony possesses an 'aura of special reliability and trustworthiness,' the proffer of such testimony must be carefully scrutinized." (citation omitted). If the direct observers of events themselves testify concerning the facts upon which experts rely, the jury will look to those observers, not to expert opinion, for insight as to what actually happened and will turn to the experts for interpretation of the events, and for other guidance, as intended. *See Clifford,* 532 A.2d at 632 (expert opinion should be admitted where it proves "useful in understanding the facts in issue").

complaining witness, where witness present and available for cross-examination).

**27.** This Court has noted its concern about the reliability of conclusory psychiatric testimony based on observations of dangerous conduct related as hearsay. *See In re James,* 507 A.2d 155, 158–59 (D.C.1986); *In re Stokes,* 546 A.2d 356, 362–63 (D.C.1988) (plurality opinion). 

**28.** Some courts have not been troubled by experts' reliance on lay hearsay testimony. *See,*

*e.g., Stevens v. Cessna Aircraft Co.,* 634 F.Supp. 137, 142 (E.D.Pa.) (admitting opinion of physician trained in aeronautical psychology, concerning deceased pilot's mental state at time of flying defective aircraft, based on interviews with pilot's friends, co-workers, and professors), *aff'd,* 806 F.2d 252 (3d Cir.1986); *Attorney Grievance Comm'n v. Nothstein,* 300 Md. at 678, 480 A.2d at 813 (permitting psychiatrist to base opinion concerning mental state of attorney facing disbarment for defrauding his firm on behavior observed by his wife and legal partner).

### D.

■ In the present case, the trial court erred by failing to conduct any inquiry concerning the reasonableness of Dr. Byrd's and Dr. Cornet's virtually exclusive reliance on hearsay data as the basis for their respective opinions as to Melton's dangerousness. For example, when Melton's counsel objected to Dr. Byrd's recounting of the punching incident, as related to him by Melton's mother, the trial judge overruled the objection and denied counsel's request for a bench conference, stating that the hearsay was "an exception." The opinions of Drs. Byrd and Cornet concerning Melton's dangerousness rested almost entirely on hearsay concerning past allegedly violent incidents, one reported to the doctors by Melton's mother, the others apparently also reported by lay observers and recorded in Melton's medical records.[29] The reported incidents may well have provided a sufficient basis for the doctors' opinions (assuming the doctors' qualifications to render such opinions). But, absent a judicial inquiry in the record assessing whether this hearsay was reasonably relied upon, *see* Rule 703, or confirming that the hearsay was admissible for its truth or otherwise because some other exception was applicable, we are left with no factual or legal basis for assessing whether or how the trial judge exercised his discretion in admitting the opinions. In sum, under the circumstances of this case, where the opinions of the psychiatrists concerning Melton's dangerousness explicitly, and almost entirely, relied on hearsay as their basis, we conclude the trial court should not have admitted the opinions without an appropriate finding.

### III.

Melton also contends that the trial court committed reversible error by failing to exercise its discretion with regard to the qualifications of the testifying psychiatrists to render expert opinions concerning Melton's dangerousness. We agree that the trial court abused its discretion in refusing to determine whether the psychiatrists were qualified to render such opinions.

At trial, counsel for Melton objected when Dr. Byrd, who had been qualified as an expert in the diagnosis and treatment of mental health, began to offer his opinion concerning the likelihood that Melton would injure himself or others.[30] Counsel argued that before admitting this opinion, the court had to find Dr. Byrd qualified to render it, noting that other Superior Court judges had refused to admit such testimony from psychiatrists testifying before them at civil commitment hearings. The court immediately overruled counsel's objection, stating, "We've been through that before." When counsel asked to be heard further on this issue, the trial court responded, "You may put it on the record if you like ... but this is the way I'm going to go."

We have held that a trial court must "exercise its discretion with reference to all the necessary criteria in admitting or excluding expert testimony," *Gant v. United States*, 518 A.2d 103, 110 (D.C.1986), and "must take no shortcuts," *Ibn–Tamas*, 407 A.2d at 635. The applicable criteria for admitting expert opinions are set forth in a three-part test:

(1) the subject matter "must be so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average lay [person]"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his [or her] opinion or inference will probably aid the trier in his [or her] search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

29. Dr. Cornet also based his opinion on Melton's "belligerence" when sick and may have been referring to his direct observation of Melton at his mother's house.

30. Counsel did not object to Dr. Cornet's opinion on Melton's dangerousness. For the reasons stated earlier, see *supra* note 3, we consider counsel's objection to the admission of Dr. Byrd's opinion sufficient to extend to Dr. Cornet.

*Dyas,* 376 A.2d at 832 (emphasis omitted) (quoting McCormick on Evidence § 13 (E. Cleary 2d ed. 1972)). The trial court must also find that the probative value of the evidence outweighs its prejudicial impact. *Ibn–Tamas,* 407 A.2d at 632.

It is not uncommon for psychiatrists to offer predictive opinions about a person's future dangerousness. *See Barefoot v. Estelle,* 463 U.S. 880, 896–903, 103 S.Ct. 3383, 3396–3400, 77 L.Ed.2d 1090 (1983). However, this does not mean every psychiatrist is qualified to offer such an opinion or, even if qualified, is in a position to do so with regard to the particular person before the court. An expert's qualifications rest on knowledge and experience, not on his or her title.[31] *See Mannino v. International Mfg. Co.,* 650 F.2d 846, 849–51 (6th Cir. 1981); *In re Agent Orange,* 611 F.Supp. at 1242. The United States Court of Appeals for the District of Columbia Circuit, considering the admissibility of expert psychological testimony in its landmark opinion in *Jenkins v. United States,* 113 U.S.App. D.C. 300, 308, 307 F.2d 637, 645 (1962), recognized that a psychologist's competence to render an expert opinion "must depend upon the nature and extent of his [or her] knowledge. It does not depend upon his [or her] claim to the title 'psychologist.' " This court has also stated, with respect to a psychologist, that his or her credentials "must be sufficient for the type of psychological testimony proffered." *Ibn–Tamas,* 407 A.2d at 637; *cf. United States v. Davis,* 772 F.2d 1339, 1342, 1344

(7th Cir.) (psychiatrist's testimony properly excluded where she lacked expertise concerning compulsive gambling), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985); *People v. Lewis,* 75 Ill.App.3d 560, 563, 31 Ill.Dec. 73, 76, 393 N.E.2d 1380, 1383 (1979) (extent of training and experience required of psychologists could vary with nature of case); *People v. Hardesty,* 139 Mich.App. 124, 129, 362 N.W.2d 787, 792 (1984) (trial court properly refused to allow clinical psychologist, to whom court sent defendant for competency exam, to offer an opinion concerning defendant's sanity at time of offenses because of psychologist's "overall lack of experience and education in evaluating the sanity of an accused"), *appeal dismissed,* 477 U.S. 902, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986); Bonnie & Slogobin, *The Role of Mental Health Professional in the Criminal Process: The Case for Informed Speculation,* 66 Va.L.Rev. 427, 457–61 (1980) (experiential credentials crucial for forensic diagnoses).[32]

■ Here, the trial court, while qualifying Drs. Byrd and Cornet as experts on the diagnosis and treatment of mental health, refused to consider Melton's counsel's objections to the psychiatrists' qualifications to predict his client's dangerousness. In declining to exercise his discretion, the trial judge commented, "We've been through that before," apparently referring to similar objections raised by counsel in other

---

**31.** Our dissenting colleague's assertion that an expert need not be a specialist in order to testify concerning matters requiring special expertise, citing *Baerman v. Reisinger,* 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966), is a correct statement of the law as far as it goes. However, this does not imply, as the dissent appears to suggest, that a trial judge does not bear a responsibility for ensuring that the non-specialist expert "is qualified to express an opinion on the subject." *Hartke v. McKelway,* 526 F.Supp. 97, 101 (D.D.C.1981) (family practitioner who performed several hundred tubal ligations not qualified to render expert opinion on standard of care for sterilization by laproscopic cauterization). *See also Will v. Richardson–Merrell, Inc.,* 647 F.Supp. 544, 549 (S.D.Ga.1986) (excluding testimony of plastic surgeon concerning relationship between ingestion of drug and birth defect).

**32.** One commentator has suggested that mental health professionals unfamiliar with the research literature on dangerousness predictions should not be qualified as experts, regardless of their educational or experiential background. *See* Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics,* 5 Am.J.Crim.L. 151, 175–77 (1977). Another has argued that courts must scrutinize the adequacy of a professional's evaluation procedures before finding him or her qualified to render admissible clinical prediction testimony. *See* Slogobin, *Dangerousness and Expertise,* 133 U.Pa.L.Rev. 97, 129 (1984). We do not here necessarily subscribe to the views expressed in these articles; we merely cite them for trial court consideration.

cases. However, as this court stated in *Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979), "when the trial court recognizes its right to exercise discretion but declines to do so, preferring instead to adhere to a uniform policy, it ... errs." We held in *Johnson* that "reversal should follow if it is discerned that the trial court did *not recognize* its capacity to exercise discretion or *did not purport to exercise it.*" *Id.* at 367 (emphasis added). Because the trial court failed to exercise required discretion concerning the admission of psychiatric opinion about dangerousness central to Saint Elizabeths' case against Melton, we conclude the court abused its discretion, warranting reversal.

## IV.

In sum, we conclude that the trial court's admission of expert testimony constituted reversible error for the reasons stated in Parts II. D. and III. B. above. Accordingly, we reverse and remand the case to the trial court with instructions to vacate the October 23, 1985 commitment order. Saint Elizabeths, of course, is free to institute whatever proceedings it deems necessary for the health and well-being of Melton and the safety of the community.

*Reversed and remanded with instructions.*

MACK, Associate Judge, Retired, concurring:

For the reasons implicit in my concerns expressed in my opinion (but not embraced by the other panel members) in *In the Matter of Gwendolyn Stokes*, 546 A.2d 356 (D.C.1988), I am concurring in Judge Ferren's opinion.

SCHWELB, Associate Judge, dissenting:

Once upon a time, long, long ago, the King of Epirus defeated his Roman adversaries in a battle at Asculum. Unfortu-

nately for him and his cause, however, a large part of his army was destroyed. "Another such victory over the Romans," his majesty exclaimed, "and we are utterly undone." PLUTARCH, *Lives, Pyrrhus,* § 21.[1] The king's name was Pyrrhus, and the kind of triumph which brought the winner such travail has come to be known as a Pyrrhic victory.

I am very much afraid that what Tommie Melton has won through litigation may be as counter-productive in the long run as the famous monarch's flawed win at Asculum. Indeed, I am constrained to wonder how many of the homeless persons who live wretched and squalid lives on grates and benches and pavements in our nation's capital are there because they have "won," through litigation or the threat thereof, or as a result of premature deinstitutionalization, the "liberty" not to be required to take medication essential to their mental health.[2]

## I

Although my colleagues do not focus on it, the central issue in this case is whether Tommie Melton, a frequently hospitalized paranoid schizophrenic, needed monitoring to ensure that he regularly took prolixin, an anti-psychotic medication. When he adhered to his regimen, he had a reasonable insight into his illness and was therefore able to function in the community. When he neglected to do so, however, often as a result of alcohol abuse, his conduct was self-destructive and, according to the evidence presented, probably dangerous to others too. It was because Mr. Melton could not be relied on to take the medication that St. Elizabeths Hospital requested and obtained an order committing him to the hospital as an out-patient, so that his compliance could be appropriately monitored while he remained in the community.

I think any reasonable person reading this record would agree, irrespective of the merits of the various legal contentions,

1. Quoted in J. BARLETT, FAMILIAR QUOTATIONS 92 (15th ed. 1980).

2. For a much-publicized case presenting such an issue, see *Boggs v. New York City Health & Hosp.*

*Corp.,* 132 A.D.2d 340, 523 N.Y.S.2d 71 (1st Dept. 1987), *appeal dismissed,* 70 N.Y.2d 972, 525 N.Y. S.2d 796, 520 N.E.2d 515 (1988).

that the need for Mr. Melton to take his medicine was compelling. Four years ago, when this case arose, he was in dire straits. Dishevelled and dirty, he had apparently not taken a bath in weeks, and had been urinating in his bedroom. He was also suffering from glaucoma, which could threaten his eyesight, and from diabetes, which could imperil life and limb. He had many bruises on his skin. His diabetes pills were found in the same bottle with his psychotropic medication. According to Dr. Byrd, Mr. Melton had once jumped out of a moving car on the way to the hospital and had threatened on another occasion to set himself on fire.

It appears that Mr. Melton was not the only person whose interests were implicated by his failure to take his medication. His mother had reported to doctors from the hospital that, on the previous day, Mr. Melton had punched her on the nose. On another occasion, according to hospital records described by Dr. Byrd, Mr. Melton had threatened his sister with a screwdriver. Dr. Cornet, who responded to the home of Mr. Melton's mother after the alleged punch, described him as belligerent and unruly before he was brought to the hospital.

As the majority correctly points out, much of the evidence presented by the government to establish these facts was based on what the medical witnesses were told by others, or what they gleaned from hospital records not in evidence. Indeed, it may be that this appeal could have been avoided if the government had presented more substantiation for the facts presented, all of which stood uncontradicted in the record.[3] Nevertheless, the "hearsay," if that is what it was,[4] appears to me to have been largely reliable because the facts related by out-of-court declarants were mutually corroborative. As the doctors suggest,

ed, at least implicitly, the illness and, in particular, Mr. Melton's failure to take medication, tended to corroborate the self-destructive behavior; the irrational acts tended to corroborate each other and the failure to medicate as well. Under these circumstances, Mr. Melton was and may still be in danger of paying a high price indeed for his "liberty" not to take much-needed medication and not to be monitored by the hospital for his own well-being.

It is unfortunate that the adversary system, which in some cases serves as a protection for basic liberty interests, *see, e.g.,* *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), turns doctors whose medical function it is to help patients into their legal adversaries in courtroom combat. As a layman, I wonder whether the relationship between psychiatrist and patient was not compromised when Mr. Melton watched his lawyer conduct a vigorous adversarial cross-examination of Dr. Cornet, whom Mr. Melton nevertheless wanted to have as his psychiatrist if he won the case.[5]

Be that as it may, this appeal is from an order in contested adversarial litigation. However Pyrrhic the victory for which Mr. Melton is striving may seem to be, he is entitled to it if there was prejudicial error in the trial court. I therefore turn to the merits.

## II

According to the majority opinion, reversal is required because "not all psychiatrists are necessarily qualified to provide expert testimony on a person's dangerousness." I must respectfully disagree with this assertion, especially as applied to the facts of this case.

As Judge (later Chief Justice) Burger wrote for the court in *Baerman v. Reising-*

---

3. Mr. Melton presented no evidence.

4. Ostensibly, the out-of-court statements were not introduced to prove the truth of the matter asserted.

5. Mr. Melton's counsel concluded his opening statement as follows:

We ask you to allow Mr. Melton to continue his arrangement, [which] he has now, which

is to be with Dr. Cornet and to live with his mother, but to let him do it on his own. Thank you.

On appeal, Mr. Melton has argued, and the majority now holds, that Dr. Cornet has not been shown to be competent to determine if Mr. Melton was dangerous to himself or others.

*er*, 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966),

> It is settled law that "[a] physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks." *Sher v. De Haven*, 91 U.S.App.D.C. 257, 262, 199 F.2d 777, 782, 36 A.L.R.2d 937 (1952), *cert. denied*, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953). The training and specialization of the witness goes to the weight rather than admissibility of the evidence, generally speaking.

Ordinarily, a specialist in a particular branch within a profession is not required. McCORMICK ON EVIDENCE § 13, at 34 & authorities cited at n. 11 (E. Cleary 3d ed. 1984). Even an ordinary medical practitioner is, and should be, permitted to testify as to a patient's sanity. 2 J. WIGMORE, EVIDENCE § 569, at 785–86 & n. 2 (Chadbourn rev. ed. 1979); *see Jenkins v. United States*, 113 U.S.App.D.C. 300, 306–07, 307 F.2d 637, 643–44 (1962) (*en banc*). The issue whether an expert is sufficiently qualified "is recognized as a matter for the trial judge's discretion, reviewable only for abuse. Reversals for abuse are rare." McCORMICK, *supra*, § 13, at 34.[6]

Both Dr. Byrd and Dr. Cornet are practicing psychiatrists. Each stated that he was eligible for board certification. Each had previously testified as an expert before the Mental Health Commission, and Dr. Byrd had done so in court as well. Mr. Melton's counsel expressly stated that he had no objection to the court's finding Dr. Cornet to be qualified as an expert.[7] If it is ever permissible for a psychiatrist to be permitted to testify as to a patient's dangerousness, I do not see how it can plausibly be contended that the judge abused his discretion in allowing Dr. Byrd and Dr. Cornet to do so.

I turn, then, to the question whether psychiatrists may testify as to dangerousness. With all due deference, I do not believe that this question can seriously be said to be in doubt. As the Supreme Court stated in *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979):

> There may be factual issues in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts *which must be interpreted by expert psychiatrists and psychologists.*

(Emphasis added to last nine words).

In *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), a capital sentencing case, the defendant argued, in conformity with the views of the American Psychiatric Association (APA),[8] that psychiatric testimony as to dangerousness was inherently unreliable and ought not to be admitted where a defendant's life was on the line. The issue was cast in constitutional terms, but the Supreme Court's response was sufficiently broad and emphatic to dispel any doubt, at least in my mind, as to how that court would rule in this case:

> The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel. In the first place, it is contrary to our cases.

*Id.* at 896, 103 S.Ct. at 3396.

\* \* \* \* \* \*

In the second place, the rules of evidence generally extant at the federal and

---

**6.** Dean Wigmore goes even further:

> the trial court must be left to determine, absolutely and without review, the fact of possession of the required qualification by a particular witness.

2 WIGMORE, *supra*, § 561, at 756 (emphasis in original).

**7.** Counsel argued that Dr. Byrd had "just finished" his training and that "we will submit [that] to consider him an expert on the basis of

what he said so far is so modest that we would ask that he not be considered as an expert at this point." The judge emphatically disagreed and found Dr. Byrd qualified.

**8.** Mr. Melton's counsel has presented for our consideration in this case the same views of the APA which were rejected by the Court in *Barefoot.*

state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but also as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, *jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.*

*Id.* at 898–99, 103 S.Ct. at 3397–98 (emphasis added).

Mr. Melton seeks to distinguish *Barefoot* on the grounds that that case involved a constitutional contention, and that psychiatric testimony as to dangerousness should be excluded as a matter of the substantive District of Columbia law of evidence. Aside from the breadth of the Court's language in *Barefoot* and its allusion to applicable rules of evidence, however, the statutory law of this jurisdiction explicitly contemplates that such determinations will be made by psychiatrists. The administrator of a public hospital may detain a person for emergency observation if the psychiatrist on duty certifies that the person

has symptoms of a mental illness and, as a result thereof, is likely to injure himself or others unless he is immediately hospitalized.

D.C.Code § 21–522 (1989). The Mental Health Commission, which is made up of psychiatrists and psychologists, is required to determine, *inter alia,* whether a patient "is likely to injure himself or other persons if allowed to remain at liberty." § 21–544. Two physicians, one of whom must be a specialist on nervous or mental disorders, are required to determine whether an allegedly mentally ill person found on certain federal reservations shall be hospitalized

"for his own safety and welfare and for the preservation of the peace and good order." § 21–902(b)(2). In proceedings to determine whether a person acquitted of an offense by reason of insanity should be released, psychiatric testimony may be submitted on the issue whether such person "has recovered his sanity ... [and] will not in the reasonable future be dangerous to himself or others." § 24–301(e)(1)—(2).

I therefore agree with the government that

to accept appellant's theory that psychiatrists cannot predict dangerousness, and therefore should not be permitted to testify on this issue, would nullify the entire legislative scheme for treatment of mentally ill persons in the District of Columbia.

The legislature has effectively decided that " 'the state of the pertinent art or scientific knowledge [permits] a reasonable opinion to be asserted ... by an expert,' " *Dyas v. United States,* 376 A.2d 827, 832 (D.C.) (*quoting* McCormick on Evidence § 13 (E. Cleary 2d ed. 1972)), *cert denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), and we would be impermissibly intruding upon a legislative prerogative if we were to challenge that judgment.

In the present case, as I have noted, Mr. Melton's dangerousness to himself and others is alleged to stem from his failure to take psychotropic medicine with the requisite regularity. In my opinion, the consequences of such failure are obviously so " 'distinctly related to ... a science ... as to be beyond the ken of the average layman,' " *Dyas, supra,* 376 A.2d at 832. It defies common sense to suggest that a lay juror knows as much about this subject as a qualified psychiatrist does. The challenged testimony will surely "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Accordingly, Dr. Byrd and Dr. Cornet were properly permitted to testify about Mr. Melton's dangerousness.[9]

---

9. I do not agree with my colleagues' theory that Judge Block failed to "exercise his discretion" as to whether the witnesses should be allowed to testify as to dangerousness. Once they had

been qualified as experts in psychiatry, there was no further discretionary determination as to their expertise for the judge to make.

### III

My colleagues assert, opinion at 636, that "not all hearsay can be reasonably relied upon as a basis for expert opinion testimony," and that the trial judge abused his discretion "by failing to conduct any inquiry concerning the reasonableness of Dr. Byrd's and Dr. Cornet's virtually exclusive reliance on hearsay data as the basis for their respective opinions." *Id.* at 647. I agree that it would have been better to allow counsel to approach the bench and make his argument on the issue,[10] but I do not think that the judge's failure to do so can possibly have changed the result.

The basic issue in this case was whether Mr. Melton was a danger to himself or others. I can discern no basis—and my colleagues offer none—for concluding that a psychiatrist (or any other reasonable person) would fail to seek information from members of a person's family to determine whether, and under what circumstances, he has done things which are dangerous to himself or to others. When such an inquiry—through direct conversation with the family members, or by reviewing hospital records—reveals information from more than one family member about several incidents, and when these incidents are themselves consistent with what a psychiatrist would expect to happen when a paranoid schizophrenic fails to take his medication, the reliability of the information is obviously enhanced.

This does not mean, of course, that everything which family members have told an expert witness is necessarily true. An expert cannot know whether it is, and the most elementary cross-examination can quickly establish the point that the expert is not speaking from personal knowledge. Indeed, neither Dr. Byrd nor Dr. Cornet purported to guarantee the truth of what Mr. Melton's mother told them or of what was in the hospital record. The lack of any such guarantee, however, does not warrant

I find the authorities relied upon by the majority for a contrary conclusion altogether inapposite. In *Jenkins v. United States,* 113 U.S.App. D.C. 300, 307 F.2d 637 (1962), the court held that even though psychologists lack medical training, those with specialized knowledge relevant to the diagnosis of insanity should nevertheless be permitted to testify. There is no suggestion in the present case that Drs. Byrd or Cornet lack medical training, and there is nothing in *Jenkins* or in the other cases cited by the majority involving psychologists which would support the exclusion of the testimony of these two witnesses.

In *United States v. Davis,* 772 F.2d 1339 (7th Cir.), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985), the only case cited on this point by the majority which involves any restriction on the admissibility of psychiatric testimony, the court sustained as a proper exercise of the trial judge's broad discretion the exclusion of the proffered testimony of a psychiatrist that the defendant's compulsive gambling made him unable to refrain from forgery or conversion, and thus rendered him insane. As the court put it,

> [the psychiatrist's] testimony shows her to be unqualified as an expert on the issue that would be before the jury. Her testimony seems illogical, inconsistent and in considerable part, incomprehensible and lacks any basis in fact. Quite clearly, it could not assist a jury to determine the central fact that would be in issue in Davis's insanity defense.

*Id.* at 1344. I find no support in *Davis* for the proposition that Judge Block abused his discretion in allowing the two psychiatric witnesses in the present case to explain to the jury the probable consequences of a paranoid-schizophrenic's failure to take his medication, especially when the question of dangerousness has been confided to psychiatrists by the statutory law of this jurisdiction.

10. In fairness to the trial judge, I think the colloquy between court and counsel quoted in the majority opinion at 6 should be considered in context. Judge Block had long specialized in mental health cases, and Mr. Fulton was the attorney from the Public Defender Service who had handled a great many of them. I think it reasonable to infer that the judge probably ruled immediately because he had decided a similar issue in a similar case in which Mr. Fulton had been counsel. Although it is understandable that the judge did not want to repeat everything, he could have avoided the problem here presented and facilitated appellate review if he had allowed counsel to argue and had explained on the record his reasons for his ruling.

It is evident from Mr. Fulton's opening statement that he was aware in advance of the issue that would arise. I suggest that in such circumstances a motion in limine should be filed, or that a ruling from the court should be sought before the seating of the jury. It has been my experience that an early request for a ruling avoids interruption and even disruption of the testimony and facilitates the orderly and thoughtful resolution of legal issues.

the exclusion of the testimony on the grounds that the expert ought not to have relied upon it.

This conclusion is fully supported by the authorities cited by the majority. As stated in the Advisory Committee's notes to Rule 703 of the Federal Rules of Evidence, a physician bases his diagnosis on information from numerous sources, including statements by patients and relatives, as well as hospital records. The expert is assumed to have the necessary skill to evaluate any second-hand information and give it only such probative force as the circumstances warrant. *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); *see also State v. Schreuder,* 726 P.2d 1215, 1223 (Utah 1986). Accordingly, the court should accord an expert wide latitude in choosing the sources on which to base his or her opinions. *See Soden v. Freightliner Corp.,* 714 F.2d 498, 505 (5th Cir.1983). Although it is proper to examine the reliability of these sources, *id.,* a trial judge may not substitute his judgment for the expert's as to what data are sufficiently reliable. *In re Japanese Elec. Prods.,* 723 F.2d 238, 277–79 (3d Cir.1983), *rev'd on other grounds sub nom. Matsashita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also United States v. Hill,* 655 F.2d 512, 514–16 (3d Cir.1981) (error to exclude psychiatric testimony as to criminal defendant's susceptibility to entrapment). The assumptions which form the basis for the expert's opinion, as well as the conclusions drawn therefrom, are subject to rigorous cross-examination. *In re Japanese Elec. Prods., supra,* 723 F.2d at 277. Juries are intelligent enough, in light of the availability of such cross-examination, to ignore what is unreliable or unhelpful. *Id.* at 279.

As my colleagues recognize, the trial court's rulings with respect to the admission of expert testimony in general, and expert psychiatric evidence in particular, are reviewable only for abuse of discretion. Majority opinion at 16 and authorities there cited. Testimony very similar to much of

that at issue here was held to be admissible in *In re Samuels,* 507 A.2d 150, 153 (D.C. 1986); *see also In re Gahan,* 531 A.2d 661, 666 n. 7 (D.C.1987) ("[t]he court, as factfinder, was entitled to learn the factors underlying Dr. Carter's opinion that Gahan was likely to inflict harm on himself by ceasing to eat");) *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 676–85, 480 A.2d 807, 812–16 (1984) (psychiatrist permitted to base his conclusion as to attorney's mental state on facts as to attorney's behavior related by the attorney's wife and by his partner).

Even a criminal defendant in a capital case is entitled not to a perfect trial, but to a fair one. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 2280, 101 L.Ed.2d 80 (1988). Accordingly, I do not think that the trial judge's summary resolution of the question of the reliability of the expert witnesses' sources warrants reversal here.

IV

Even if, as I have concluded, the psychiatric witnesses testified on the basis of the kind of data on which experts customarily and reasonably rely, I have some concern for another reason about the admission and use of the evidence. If we look at the substance rather than the form of what occurred, the second-hand testimony about Mr. Melton having punched his mother came to the jurors' attention in such a way that they might well have considered it for the truth of the out-of-court statement. This may also have occurred with respect to some other incidents.

On October 17, 1985, Dr. Byrd testified that Mr. Melton

became impulsive and lost control of his temper, which is a characteristic of a schizophrenic. And he punched his mother in the nose and became very angry with her.

The judge gave no contemporaneous instruction as to the purpose for which this testimony was received.

Four days later, during his final instructions, the judge told the jurors, with respect to testimony by Dr. Byrd and Dr.

Cornet as to information given to them by other individuals, that

> these statements are admitted only to demonstrate the information relied upon by the doctors in forming their conclusion. They are to be considered by you only for the purpose of evaluating the reasonableness and correctness of the doctors' conclusions. They are not to be considered by you as actual proof of the incidents described. They are hearsay and as such are not admissible to establish the truth of the matters asserted by them.

This court has recently noted that some students of the law of evidence consider the distinction sought to be articulated in such a "limiting" instruction as "most unlikely to be made by juries." *In re Samuels, supra,* 507 A.2d at 153 n. 5. As Judge Salzman aptly remarked for the court in that case,

> [c]onceptual problems are bound to arise when a judge tells a jury that the jury may consider psychiatric diagnoses based on medical records customarily relied on in professional practice, but then tells the jury that it may not consider the "truthfulness" of those records for any other purpose.

*Id.*

These conceptual problems are even more serious with respect to a discrete dramatic act like punching one's mother on the nose. To tell the jurors that they are to consider the testimony about the punch as a basis for the expert's finding of dangerousness, but not with respect to whether Mr. Melton punched his mother, may call for mental gymnastics which only the most pristine theoretician could perform. I have the impression that the reaction of that elusive individual, the reasonable person, would be that you cannot believe that the testimony about the punch tends to show that Mr. Melton is dangerous unless you first believe that he actually punched his

mother. Since the expert apparently believed that he punched her—and I agree with the majority, opinion at 646, that an expert's reliance on hearsay is an implied assertion of belief in its truth—the juror is likely to believe it too. I therefore apprehend that the distinction sought to be made becomes "ephemeral." *Thompson v. United States,* 546 A.2d 414, 421 (D.C.1988).

The problem is a perplexing one, because it is difficult to articulate reasonable or workable limits on any rule which excludes testimony of the kind here at issue. In the present case, however, the parties have primarily addressed the questions decided by the majority and discussed in Parts II and III of this opinion, and have touched on this issue only tangentially. No objection was made to the lack of a contemporaneous instruction, or to the wording of the instruction ultimately given.[11] For this reason, and because I am in dissent, I "simply note [my] concern and leave the question for a case in which the issue is squarely presented and fully briefed." *In re Samuels, supra,* 507 A.2d at 153 n. 5.

## V

Mr. Melton also contends that the judge committed prejudicial error by refusing to grant a directed verdict in his favor at the close of the government's case. He bases this contention on the proposition that "the hospital presented scant first-hand evidence of Mr. Melton's behavior." My colleagues do not reach this question, since they reverse on other grounds. As I do not join them in reversal, I address the contention briefly, and reject it as wholly unpersuasive.

On a motion for a directed verdict, the evidence must be viewed in the light most favorable to the party against whom the verdict is sought. *Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973) (*per curiam*). " 'Where there is substantive evidence in

---

**11.** If I understood correctly the response of counsel for Mr. Melton to questions asked from the bench at oral argument, he was not pressing the issue which I have discussed in Part IV of this dissent. Since there is some similarity between that issue and the question of the reliabil- ity of the experts' sources, I am not prepared to say that the point was waived. In view of my colleagues' disposition of the other questions raised, the issue of waiver is presently of no practical consequence.

support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side ...' " *Rich v. District of Columbia*, 410 A.2d 528, 534 (D.C.1979) (quoting *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 354 (4th Cir.1941). A verdict may be directed only when, viewing the evidence in the light most favorable to the non-moving party, the court finds, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, that there is only one verdict which reasonable jurors could reach. *Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir.1974).

Both Dr. Byrd and Dr. Cornet testified that Mr. Melton was mentally ill and dangerous to himself and others. Reasonable jurors could surely have believed them. Once their testimony to this effect was admitted—and a motion for a directed verdict is surely not a proper vehicle for arguing the admissibility of evidence—there was simply no basis whatever to sustain the motion.[12]

## VI

In his final instructions, Judge Block told the jury that

> You need not find that [Mr. Melton] is likely to injure himself and other persons. You need only find one or the other is likely to happen.

The relevant portion of the verdict form stated

> We, the Jury, find that the Respondent, Tommie Lee Melton, because of mental illness is X or is not—likely to injure

himself or others [13] if allowed to remain at liberty.

There was no objection to the instruction or to the form.

In reversing the judgment, my colleagues have not ordered a new trial, which is probably a wise course of action in light of the staleness in late 1989 of such evidence as an alleged punch in the nose in 1985. Nevertheless, if there is a new trial, I suggest that the instruction and the verdict form both be revised.

The instructions and verdict form utilized by the trial judge would permit Mr. Melton to be committed without a unanimous finding either that he was dangerous to himself or that he was dangerous to others. If six jurors concluded that Mr. Melton was a danger to himself, and six different jurors found him to be dangerous to others, then, consistent with the court's instruction, the verdict form could be completed unfavorably to him. Upon retrial, the instructions and verdict form should reflect that the jurors must be unanimous as to which kind of danger—to himself or others—they find that Mr. Melton poses. *See Scarborough v. United States*, 522 A.2d 869 (D.C.1987) (*en banc*).[14]

## VII

For the foregoing reasons, I would affirm the judgment of the trial court.

---

12. *Cf. In re Penn*, 143 U.S.App.D.C. 248, 251, 443 F.2d 663, 666 (1970), in which the court found it unnecessary to reach the issue whether a person may be committed wholly on the basis of hearsay testimony concerning events which formed the basis for psychiatric opinion because, as in the present case, there was other evidence as well.

13. The words "or others" are inserted on the form in handwriting. The jurors checked the

space after "is" and crossed out the words "is not."

14. I would, however, find no "plain error" here. *See Shivers v. United States*, 533 A.2d 258, 261–62 (D.C.1987).